**Alton J. SMART, Plaintiff–Appellant,**

v.

**STATE FARM INSURANCE CO., Defendant–Appellee.**

**No. 88–1910.**

United States Court of Appeals, Seventh Circuit.

Argued Nov. 9, 1988.

Decided Feb. 15, 1989.

James E. Doyle, Jr., Doyle & Ritz, Madison, Wis., for plaintiff-appellant.

Claude J. Covelli, Boardman, Suhr, Curry & Field, Madison, Wis., for defendant-appellee.

Before CUMMINGS, WOOD, Jr., and CUDAHY, Circuit Judges.

CUMMINGS, Circuit Judge.

Plaintiff Alton J. Smart appeals from the district court's grant of summary judgment in favor of defendant State Farm Insurance Company ("State Farm"). Smart alleges that State Farm failed to pay a claim for medical expenses under a group insurance policy issued by State Farm to employees of the Chippewa Health Center, which is owned and operated by the Lac Du Flambeau Band of the Lake Superior Chippewa Tribe ("Chippewa Tribe" or "Tribe"). The district court determined that this action for benefits arises under Section 502(a)(1)(B) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), and consequently State Farm's decision to deny benefits to Smart could only be reversed if the decision was arbitrary and capricious. *Brown v. Retirement Committee of Briggs & Stratton*, 797 F.2d 521, 525 (7th Cir.1986), certiorari denied, 479 U.S. 1094, 107 S.Ct. 1311, 94 L.Ed.2d 165 (1987). Smart argues that ERISA does not govern an employee benefits plan established and operated by an Indian Tribe for Tribe employees, or, alternatively that State Farm's decision to deny him benefits was arbitrary and capricious.

## I. Facts And Procedural History

Smart is an enrolled member of the Bad River Band of the Chippewa Tribe and an employee of the Chippewa Health Center, which is owned and operated by the Lac Du Flambeau Band of the Tribe within the boundaries of its reservation. State Farm issued to the Chippewa Health Center a group health policy offering medical and hospital benefits to employees and eligible dependents. Smart applied and became insured under the policy. In late September 1985, Smart decided to enroll his minor son, Brian Jackson, in the health plan and obtained the necessary application forms. On October 30, 1985, Smart submitted the application to enroll Brian. State Farm returned the application because Smart had failed to complete questions concerning Brian's medical history. Included in the incomplete medical history were questions asking whether Brian had any sickness or mental or physical impairment, had consult-

ed any doctor for any reason within the past five years, or been told hospitalization was required. Smart answered those questions in the negative and resubmitted the application in November 1985. State Farm then added Brian as a beneficiary effective December 1, 1985.

Allegedly unknown to Smart, Brian had been examined by a psychologist for drug and alcohol abuse as well as for emotional difficulties. On October 20, 1985, while Smart was out of town, Brian was detained in the Milwaukee County Juvenile Detention Center. While there, on that same date he was interviewed and tested by Dr. Burton S. Silberglitt, a clinical psychologist. Dr. Silberglitt later submitted an undated report to the Milwaukee County Department of Social Services and the Milwaukee County Court recommending psychotherapy, with an emphasis placed on overcoming anxieties related to familial relations and the elimination of drug and alcohol abuse. The record does not show when the report was completed or filed with the Social Services Department or the County Court.

On December 23, 1985, approximately two months after Dr. Silberglitt's examination and one month following Smart's application, Brian was admitted to the Kettle Moraine Hospital in Oconomowoc, Wisconsin, for drug and alcohol abuse. He remained an in-patient until January 31, 1986. Subsequent to Brian's discharge from the hospital, Smart filed a claim with State Farm for reimbursement of expenses associated with Brian's hospitalization. During its investigation of the claim, State Farm discovered Dr. Silberglitt's report. Because the hospitalization expenses for which Smart sought reimbursement were for drug and alcohol abuse, which figured prominently in Dr. Silberglitt's earlier report and recommended treatment, State Farm denied the claim on July 8, 1986. Smart protested the adverse decision in September 1986 and was informed by David Clark, a State Farm representative, that Dr. Silberglitt's recommendations indicated that Brian had a pre-existing condition as defined in the policy which was not

disclosed on the enrollment application. A pre-existing condition, defined as an "injury or sickness for which medical advice or treatment was recommended or received by a physician within a six month period preceding the effective date of coverage ... or the existence of symptoms which would cause an ordinarily prudent person to seek diagnosis, care or treatment within a six month period preceding the effective date of coverage....", constitutes ground for exclusion under the policy.

Smart filed this action on September 28, 1987, in the Circuit Court for Wood County, Wisconsin, protesting State Farm's refusal to reimburse him for Brian's hospitalization expenses. On October 19, 1987, State Farm removed this action to the Western District of Wisconsin, premising federal jurisdiction upon Section 502(a)(1)(B) of ERISA (29 U.S.C. § 1132(a)(1)(B)). The district court granted State Farm's motion for summary judgment on April 7, 1988, simultaneously filing an opinion (App. A–6—A–10).

The issue on appeal is whether the district court erred in concluding that ERISA controls this dispute. Smart maintains his argument raised in the district court that, because his employer is an independent sovereign, *viz.*, an Indian Tribe that is signatory to a treaty with the federal government, ERISA does not apply. He argues that enforcing federal legislation such as ERISA on an independent sovereign Tribe would have the resulting, and congressionally unintended, effect of hindering its right of self-governance. The parties agree that if ERISA does not govern this dispute, then the district court was without jurisdiction and the dispute should be resolved by a Wisconsin state court applying Wisconsin law.

Alternatively, Smart argues that if ERISA does control this dispute, then the district court erred by granting summary judgment in favor of State Farm. According to plaintiff, State Farm's decision to deny his claim was arbitrary and capricious and therefore should have been reversed by the district court.

## II. Discussion

### A. Appropriateness of Summary Judgment

Summary judgment is properly granted only when no genuine issues exist as to any material facts, and when the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). All facts must be construed in the light most favorable to the party opposing the motion for summary judgment and inferences drawn in that party's favor. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Beard v. Whitley REMC*, 840 F.2d 405, 410 (7th Cir.1988). The party opposing summary judgment may not simply rest on the pleadings, but rather must affirmatively demonstrate by specific factual showings that there is a genuine issue of fact requiring trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). If there is no triable issue, the district judge should enter judgment. The proper standard for entering judgment pursuant to a motion for summary judgment mirrors that of a directed verdict, Fed.R.Civ.P. 50(c), *viz.*, the district court must direct a verdict if under the governing law, there can be but one reasonable conclusion as to the verdict. *Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511 (additional citations omitted).

On appeal, since the district court has concluded that no factual issues remain, this Court reviews the record and the district court's determinations *de novo*. Whether a genuine issue of material fact exists is a legal determination, subject to appellate review. *Brock v. American Postal Workers Union*, 815 F.2d 466, 469 (7th Cir.1987). If the record indicates that inferences could have been made which are more favorable to the party opposing summary judgment, and contrary to those inferences actually drawn by the district court, so that a different verdict could possibly result, then summary judgment should be reversed. *Munson v. Friske*, 754 F.2d 683, 690 (7th Cir.1985).

**B. Applicability of ERISA to an Indian Tribe Employer**

■ Indian Tribes are " 'distinct, independent political communities, retaining their original natural rights' in matters of local self-government." *Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 55, 98 S.Ct. 1670, 1675, 56 L.Ed.2d 106 (1978), citing *Worcester v. Georgia,* 6 Pet. 515, 559, 8 L.Ed. 483 (1832). And while Indian Tribes still have the power and authority to govern and regulate internal affairs through the enactment and enforcement of substantive law, *Santa Clara Pueblo,* 436 U.S. 49, 98 S.Ct. 1670 (membership in Tribe); *United States v. Quiver,* 241 U.S. 602, 36 S.Ct. 699, 60 L.Ed. 1196 (domestic relations); *Jones v. Meehan,* 175 U.S. 1, 20 S.Ct. 1, 44 L.Ed. 49 (1899) (rules of inheritance), they are no longer possessed of the "full attributes of sovereignty." *United States v. Kagama,* 118 U.S. 375, 381–82, 6 S.Ct. 1109, 1112–13, 30 L.Ed. 228 (1886). Their sovereignty is not absolute, for Congress has plenary power to limit, modify or even eliminate the powers of self-governance which Tribes may have traditionally possessed. *Santa Clara Pueblo,* 436 U.S. at 56, 98 S.Ct. at 1676 (additional citations omitted); see also F. Cohen, Handbook of Federal Indian Law 282 (1982 ed.). Unlike the States, Indian Tribes possess limited sovereignty, subject to complete defeasance by Congress. *Rice v. Rehner,* 463 U.S. 713, 103 S.Ct. 3291, 77 L.Ed.2d 961 (1983).

The issue before us is whether Congress intended ERISA to include an employment benefit plan which is established and maintained by an Indian Tribe employer for the benefit of Indian employees working at an establishment located entirely on an Indian reservation. Congressional intent is paramount in determining the applicability of a statute to Indian Tribes. On its face ERISA fails to reveal Congress' intent as to the Act's applicability to Indian Tribe employers. Smart and State Farm derive contradictory congressional intent from the Act's silence: Smart argues that Congress' failure to specify inclusion of Indians within ERISA is dispositive and Tribe sovereignty must be maintained, while State Farm contends that statutes are presumed to include Indian Tribes unless Congress expressly excludes them.

The general rule, pronounced in *Federal Power Comm'n v. Tuscarora Indian Nation,* 362 U.S. 99, 116, 80 S.Ct. 543, 553, 4 L.Ed.2d 584 (1960), is that a "general statute in terms applying to all persons includes Indians and their property interests." *Tuscarora* presumes that when Congress enacts a statute of general applicability, the statute reaches everyone within federal jurisdiction not specifically excluded, including Indians and Tribes.

But there is a significant *caveat* to the *Tuscarora* rule. Statutes of general application that would modify or affect Indian or Tribal rights sustained by treaty or other statute must specifically evince Congress' intent to interfere with those rights before a federal court will construe the statute in issue against those rights. See, *e.g., Washington v. Fishing Vessel Ass'n,* 443 U.S. 658, 99 S.Ct. 3055, 61 L.Ed.2d 823 (1979); *Morton v. Mancari,* 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974); *Squire v. Capoeman,* 351 U.S. 1, 76 S.Ct. 611, 100 L.Ed. 883 (1956). Although Congress still retains plenary power to alter those rights, see *Rice, supra,* courts for good reason are reluctant to apply general statutes to the derogation of Indian rights without express evidence of Congress' intent. General statutes, however, whose concerns are widely inclusive and do not affect traditional Indian or Tribal rights, are typically applied to Indians. In *Donovan v. Coeur d'Alene Tribal Farm,* 751 F.2d 1113 (9th Cir.1985), the Ninth Circuit, after accepting the general rule of *Tuscarora,* then identified three specific scenarios when the exception would arise:

A federal statute of general applicability that is silent on the issue of applicability to Indian Tribes will not apply to them if: (1) the law touches "exclusive rights of self-governance in purely intramural matters"; (2) the application of the law to the tribe would "abrogate rights guaranteed by Indian treaties"; or (3) there is proof "by legislative history or some other means that Congress intended [the

law] not apply to Indians on their reservations ..." [citing *United States v. Farris*, 624 F.2d 890, 893–894 (9th Cir. 1980)]. In any of these three situations, Congress must *expressly* apply a statute to Indians before we will hold that it reaches them.

*Coeur d'Alene*, 751 F.2d at 1116 (emphasis in original). Thus in *United States v. White*, the Eighth Circuit refused to reverse the acquittal of an Indian accused of illegally poaching an eagle on a reservation where a treaty granted the Tribe hunting rights on the reservation. *United States v. White*, 508 F.2d 453 (8th Cir.1974).

Nowhere in ERISA is mention made of the Act's applicability to Indian Tribe employers operating a business employing Indians on a reservation. Therefore, consistent with the general rule of *Tuscarora* and the exception thereto, it must be determined whether ERISA is a statute of general application and, if so, whether its application to the Chippewa Tribe would modify an existing right of the Tribe secured under treaty or other statute or a right essential to self-governance of intramural matters.

ERISA is a "comprehensive and reticulated statute," *Alessi v. Raybestos–Manhattan, Inc.*, 451 U.S. 504, 510, 101 S.Ct. 1895, 1899, 68 L.Ed.2d 402 (1981) (citations omitted), regulating, among other things, employee welfare benefit plans.[1] The purposes of ERISA are twofold, to protect interstate commerce and the participants and beneficiaries of such plans.[2] ERISA applies to any employee benefit plan established or maintained by an employer "engaged in commerce or in any industry or activity affecting commerce...." Section 4(a)(1) (29 U.S.C. § 1003(a)(1)). Section 4(b) (29 U.S.C. § 1003(b)) excludes certain plans from coverage, offering narrowly defined exemptions for church and governmental plans.[3] ERISA preempts state laws which purport to regulate or govern employee benefit plans, and provides the exclusive remedy for putative beneficiaries seeking to recover benefits under a covered plan. Section 502(a)(1)(B) (29 U.S.C. § 1132(a)(1)(B)); *Pilot Life Insurance Co. v. Dedeaux*, 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987).

ERISA is clearly a statute of general application, one that envisions inclusion within its ambit as the norm. The exemptions from coverage are explicitly and specifically defined, as well as few in number. Accordingly, there is no doubt that the Chippewa Health Center is an "employer" within the broad meaning of ERISA. Equally certain is that the group health

---

1. Section 3(1) of ERISA (29 U.S.C. § 1002(1)) defines the scope of coverage, providing in pertinent part:

    The terms "employee welfare benefit plan" and "welfare plan" mean any plan, fund or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through its purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits....

2. The purposes of ERISA are stated in Section 2(b) (29 U.S.C. § 1001(b)), which provides:

    It is hereby declared to be the policy of this Act to protect interstate commerce and the interests of participants in employee benefit plans and their beneficiaries, by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto, by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions and ready access to the Federal courts.

3. Section 4(b) (29 U.S.C. § 1003(b)) also excludes some particularized plans, *viz.:* plans maintained solely for the purpose of complying with applicable workmen's compensation or unemployment compensation or disability insurance laws, plans maintained outside the United States primarily for the benefit of nonresident aliens, excess benefit plans that are unfunded. The narrow exemptions for church and governmental plans are more specifically articulated in Section 3(32) and (33) (29 U.S.C. § 1002(32) and (33)). Governmental plans include those of the federal and state governments, as well as agency and political subdivisions thereof, and international organizations which are similarly exempt from taxation under the International Organizations Immunities Act, 22 U.S.C. § 288 *et seq.* Church plans are defined in great detail in Section 3(33).

plan issued by State Farm is the type of employee benefit plan contemplated by ERISA. However, the absence of congressional intent in the language of ERISA with respect to Indian and Tribal rights is not necessarily determinative of this dispute. Rather, it is necessary to turn to the final relevant factor: Whether ERISA, a statute of general application, if applied to the Chippewa Tribe would modify or affect rights provided in a treaty or other statute or rights essential to self-governance of intramural matters.

The Tribe is a signatory to treaties with the federal government adopted in 1837, 1842 and 1854.[4] These treaties, particularly the Treaty of 1854, set aside certain lands for the use and occupancy of the Tribe. The reservation of lands by treaty to Indian Tribes for their occupancy and use has been regularly understood as the establishment of the "lands within the exclusive sovereignty of the [Tribe] under general federal supervision," *McClanahan v. Arizona State Tax Comm'ner*, 411 U.S. 164, 175, 93 S.Ct. 1257, 1264, 36 L.Ed.2d 129 (1973), and State Farm rightly does not challenge the Tribe's right to self-governance in intramural matters (Br. 11). Smart contends that the Tribe's right of self-governance would be affected by application of ERISA to the Chippewa Health Center. No other Tribal rights are in issue.

Smart relies on *Donovan v. Navajo Forest Products Industries*, 692 F.2d 709 (10th Cir.1982), in which the Tenth Circuit addressed the issue of whether the Occupational Health and Safety Act ("OSHA"), 29 U.S.C. § 651 *et seq.*, applied to a business concern wholly owned and operated by the Navajo Tribe on the Navajo reservation. OSHA, a regulatory scheme of general application which is silent about Indian matters, is designed to improve employment safety and provides for among other things on-site inspections by federal agents. Concluding that OSHA did not apply, the court premised its holding primarily on the basis that the Navajo Tribe was signatory to a treaty with the United States that specifically provided the Tribe with the right to exclude any agent of the federal government from the reservation. Application of OSHA which requires on-site inspection would have upset a specific right provided by treaty.

In *Coeur d'Alene*, the Ninth Circuit also was presented with the question of whether OSHA applied to a commercial enterprise wholly owned and operated by an Indian Tribe. Unlike the Tenth Circuit, the Ninth Circuit rejected the argument that OSHA did not apply to the Coeur d'Alene Tribe. *Navajo Forest Products Industries* was distinguished because the Coeur d'Alene was not signatory to a treaty, nor could it point to a document which granted the Tribe the right to exclude federal agents from the reservation. Consequently, no specific right secured by a treaty would be upset by applying OSHA to that Tribe. The *Coeur d'Alene* court also decided that application of OSHA would not unduly interfere with Tribal self-governance in intramural affairs. After initially taking notice that Tribe-owned and -operated businesses already were covered by substantial federal laws, for example the federal income tax code, the court determined that since the Tribe sold produce on the open market and was involved in interstate commerce, the business could not then be characterized as purely intramural or essential to self-government, so that OSHA would not affect its sovereignty. 751 F.2d at 1116. Thus, no specific Indian right, by treaty or other statute, was affected by OSHA, nor was Tribal self-governance impinged in any way.

In the case before us, Smart argues that since the Chippewa Tribe is signatory to a treaty with the United States, the situation here is more closely analogous to *Navajo Forest Products Industries* than *Coeur d'Alene*. We disagree. Simply because a treaty exists does not by necessity compel a conclusion that a federal statute of general applicability is not binding on an Indi-

---

4. For the text of these treaties see *United States v. Bouchard*, 464 F.Supp. 1316, 1364–76 (W.D. Wis.1978) (later reversed, *Lac Courte Oreilles* *Chippewa Band v. Voight*, 700 F.2d 341 (7th Cir.1983), certiorari denied, 464 U.S. 805, 104 S.Ct. 53, 78 L.Ed.2d 72).

an Tribe. More than a few federal statutes of general application have already been applied to Tribes that are signatories to treaties with the United States. The critical issue is whether application of the statute would jeopardize a right that is secured by the treaty. In *Navajo Forest Products Industries,* the significance of the treaty was that a specific right would be compromised, *viz.,* the right to exclude unwanted federal OSHA inspectors. Thus while criminal charges of poaching were dismissed against the defendant in *United States v. White,* 508 F.2d 453 (8th Cir. 1974), because a treaty had granted broad hunting rights, general federal criminal jurisdiction is routinely applied to members of Indian Tribes with treaty rights who reside on a reservation, *Stone v. United States,* 506 F.2d 561 (8th Cir.1974), certiorari denied, 420 U.S. 978, 95 S.Ct. 1405, 43 L.Ed.2d 659.

The treaties to which the Chippewa Tribe are signatory do not delineate specific rights in a manner comparable to the treaty in *Navajo Forest Products Industries.* The Chippewa treaties simply convey land within the exclusive sovereignty of the Tribe, see *McClanahan,* 411 U.S. at 175, 93 S.Ct. at 1264, and contain no provisions comparable to those in the Navajo treaty. Smart fails to identify and our own review has failed to uncover a single specific treaty or statutory right that would be affected by application of ERISA.

The next issue is whether application of ERISA would impinge upon the Tribe's self-governance in intramural affairs. Smart argues that application of ERISA to the Chippewa Tribe would interfere with the Tribe's exclusive right of self-government because ERISA would formally prescribe the relationships between a Tribal employer and its employees. Additionally, Smart cites the exemptions granted to federal and state governments in ERISA as indications that ERISA interferes with sovereignty and that Congress intended that ERISA not apply to sovereigns including Indian Tribes.

Smart's argument that ERISA will interfere with the Tribe's right of self-government is overbroad. A statute of general application will not be applied to an Indian Tribe when the statute threatens the Tribe's ability to govern its intramural affairs, but not simply whenever it merely affects self-governance as broadly conceived. Any federal statute applied to an Indian on a reservation or to a Tribe has the arguable effect of eviscerating self-governance since it amounts to a subordination of the Indian government. But Indian Tribes are not possessed of absolute sovereignty. The "right of tribal self-government is ultimately dependent on and subject to the broad power of Congress." *White Mountain Apache Tribe v. Bracker,* 448 U.S. 136, 143, 100 S.Ct. 2578, 2585, 65 L.Ed.2d 665 (1980). Statutes of general application are already applied to Indian Tribes which have the same arguable effect of interfering with the Tribe's ability of self-governance by defining Tribe-employer relations with employees, for example federal employment withholding taxes, which are applied to Indian Tribe employers. See F. Cohen, Handbook of Federal Indian Law 399 (1982 ed.) ("[T]here can be little doubt that tribes are subject to [the withholding statute's] requirements as employers, and Indians are covered as employers or employees. * * * Tribes and Indians have in fact complied with this law, and there seems no controversy over it.").

The application of ERISA to this case would not impermissibly upset the Tribe's self-governance in intramural matters.[5] ERISA does not broadly and completely define the employment relationship—even less so than the federal withholding tax. It is only applied to an employment relationship if the employer decides to offer an employee benefit plan. Even then, ERISA

5. Smart cites an exception to the holding in *Coeur d'Alene* which he asserts supports his proposition that whenever a statute of general application interferes with a Tribe's ability to govern itself, the statute should not be applied absent explicit congressional intent (Br. 12–13). But *Coeur d'Alene* limits the exception only to those "purely intramural matters such as conditions of tribal membership, inheritance rules, and domestic relations." 751 F.2d at 1116. The concept is clearly more limited then the broad vision of sovereignty that Smart portrays.

merely requires reporting and accounting standards for the protection of the employees.[6] Moreover, the activity underlying this challenge to ERISA is the Tribe's subscription of services and pooling of risks with State Farm, an outside, non-Indian agent. ERISA is instructive on how a covered health insurance plan operates vis-á-vis the beneficiaries and the trustee, not between the Chippewa Health Center and Smart. In sum, plaintiff has failed to demonstrate how ERISA will intrude upon Tribal self-governance; ERISA merely imposes beneficiary protection while in no way limiting the way in which the Tribe governs intramural matters.

Finally, with respect to Smart's contentions that the exemptions provided for state and local governments indicate Congress' unwillingness to have ERISA apply to sovereigns generally, and thus Indian Tribes should also be similarly exempt, there is no clear evidence of congressional intent to exempt them. The analogy is particularly inapt given the significant differences between states and their political subdivisions on one hand and Indian Tribes on the other. See *Confederated Tribes of Warm Springs Reservation of Oregon v. Kurtz,* 691 F.2d 878, 880 (9th Cir.1982) (distinguishing Tribes from States and their political subdivisions); *United States v. Barquin,* 799 F.2d 619 (10th Cir.1986) (refusing to hold that Indian Tribe was within ambit of "State or local government agency" as used in 18 U.S.C. § 666(c)). Significant concerns of federalism, peculiar to Federal–State relations, account for federal deference to the autonomy of state government. Federalism uniquely concerns States; there simply is no Tribe counterpart. Smart is unable to point to any evidence of congressional intent that

ERISA is not applicable to Tribe employers and Indians.

**C. Decision to Deny the Claim Not Arbitrary and Capricious**

Having determined that ERISA governs the dispute, it is necessary to turn to the district court's finding that the decision to deny benefits was not arbitrary and capricious.[7] Citing *Wardle v. Central States,* 627 F.2d 820 (7th Cir.1980), the district court noted that both parties agreed that was the proper standard of review (App. A–8—A–9). We may not substitute our judgment for State Farm's, but rather must determine whether in light of the relevant facts, State Farm articulated a satisfactory explanation for its action, including a rational connection between the facts found and the choice made. *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Ins.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983). A decision by the trustee of an employee benefits plan is arbitrary and capricious if the trustee relies upon "factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before [it] or is so implausible that it could not be ascribed to a difference in view or the product of [its] expertise." *Motor Vehicle Manufacturers Ass'n,* 463 U.S. at 43, 103 S.Ct. at 2866–67.

State Farm defends its decision to deny benefits on the basis that Brian's hospitalization was the result of an excludable pre-existing condition as defined in the policy. The policy for which Brian was enrolled specifically excluded coverage for a pre-existing condition defined as "an injury or sickness for which medical advice or treatment was recommended by or received

---

**6.** In *Coeur d'Alene,* the Ninth Circuit determined that despite the intrusive nature of OSHA, which requires among other things mandatory on-site inspections, its application would not diminish Tribal sovereignty. The application of ERISA in this instance would of course be less intrusive than OSHA.

**7.** To hold a trustee liable for denial of benefits under an employee benefits plan, a complaining

party must establish that the decision or conduct was arbitrary, capricious or motivated by bad faith. *Reilly v. Blue Cross & Blue Shield United of Wisconsin,* 846 F.2d 416, 419–20 (7th Cir.1988). Smart never alleged bad faith on the part of State Farm; therefore, this opinion only considers whether State Farm's decision was arbitrary and capricious.

from a physician within a six month period preceding the effective date of coverage ... or the existence of symptoms which would cause an ordinarily prudent person to seek the diagnosis, care or treatment within a six month period preceding the effective date of coverage." Brian's pre-existing condition is evident by his long-term substance abuse, the findings and recommended treatment of Dr. Silberglitt, and his hospitalization a short time later. None of the facts surrounding Brian's illness were disclosed on the application form completed by Smart.

Smart argues that he did not know of Dr. Silberglitt's examination of Brian in November 1985 when he submitted the application along with the medical history form concerning Brian. Smart also claims that since Dr. Silberglitt's written evaluation and recommendations as to Brian were undated, the report may have been prepared after Smart submitted the medical history form. Therefore, according to Smart, on motion for summary judgment, the burden was on State Farm to show that Dr. Silberglitt's report was issued before Smart submitted the completed application in November.

Smart's arguments are without merit. Under the terms of the policy, knowledge of the incorrectness of answers in the medical history questionnaire is irrelevant. It does not matter whether Smart deliberately falsified his answers, only that his answers were in fact false. Question 4a(1) of the medical history form asked whether Brian had any sickness or mental or physical impairment, to which Smart answered no. Although Smart may not have realized it at the time, there was already at the very least a suspicion that Brian was suffering from mental anxiety as well as substance dependency, which is why the Milwaukee juvenile authorities had Dr. Silberglitt examine him. Question 4a(2) asked whether Brian had consulted any doctor or been to a hospital or clinic for any reason within the last five years, to which Smart incorrectly answered no. Finally, Question 4a(3) asked whether Brian had been told that hospitalization was needed, to which Smart again answered no. Actually, a month later Brian was in fact hospitalized. Consequently, while Smart may have answered the questions to the best of his belief at that time, these answers were nonetheless incorrect.

Smart also complains that the district court erred by saddling him with the burden of proving that Dr. Silberglitt's undated report was prepared and released after Brian's enrollment in the health plan. According to plaintiff, it is quite possible that the report was not finished until after Brian's enrollment and thus not a diagnosis of a condition prior to enrollment. Smart argues that State Farm should have to prove that the report was prepared prior to Brian's enrollment to justify its conclusion that Brian suffered from an illness prior to enrollment. Since the date of completion of the report is in issue and this dispute was before the district court on motion for summary judgment, Smart contends that the district court should have drawn the inference in his favor, that the report was filed after Brian's hospitalization.

Smart is correct in his assertion that on motion for summary judgment, the district court should draw all inferences in favor of the party opposing the motion for summary judgment. But that does not change the outcome here. Smart still had to satisfy the difficult burden of showing that State Farm's decision to deny him benefits was arbitrary and capricious, not merely proffer arguments that the decision was wrong. Given the facts uncovered by State Farm while investigating Smart's claim for reimbursement, *viz.*, that Brian had a long history of emotional illness and substance abuse, that he was examined by Dr. Silberglitt on October 20, 1985, which was not revealed on the application form, and that Dr. Silberglitt's report indicated an illness which was treated by hospitalization less than a month following Brian's enrollment in the health plan, State Farm's decision to conclude that Brian had a pre-existing condition at the time he was enrolled in the health plan in November 1985 is not arbitrary and capricious. Even assuming that the report was in fact prepared after Brian was enrolled in the health plan, State Farm still had ample

reason to believe that Dr. Silberglitt had earlier orally reported his findings or at the very least that his findings were available upon request prior to Brian's enrollment. A patient cannot rely on his own failure to inquire as to the results of his doctor's examination for the conclusion that the doctor had not yet reached a result. Moreover, the policy excluded coverage for illness which had manifested symptoms prior to enrollment such that an ordinarily prudent person would seek diagnosis, care or treatment (App. A–26). A review of the facts, regardless of whether Smart actually was aware of them at the time he submitted the application, indicates that a reasonable person would have sought care or treatment before December 1, 1985, the date of enrollment; the juvenile authorities' October 1985 decision to have Brian examined attests to this finding. State Farm did not have to prove that its decision was right, and Smart had to prove more than its decision was wrong. He had to prove that the decision was arbitrary and capricious. This he failed to do.

### III. Conclusion

ERISA, a statute of general application without an expressed congressional intent with respect to coverage of Indian Tribe employers, does not affect a Tribe's ability to govern itself in intramural matters, nor does it affect a specific right secured to the Lake Superior Chippewa Tribe by treaty or other statute. Consequently, ERISA applies to the Chippewa Health Center employee benefits plan. The decision of State Farm, the trustee of an employee benefits plan, to deny group health benefits to a beneficiary will not be upset on review unless the decision is shown to be arbitrary and capricious. State Farm's decision to deny benefits for Brian Jackson's hospitalization was not arbitrary and capricious because the evidence clearly shows that the application form relied upon by State Farm included inaccuracies that contributed to Brian's acceptance in the health plan, which would not have occurred but for the inaccuracies. Finally, the conclusions relied upon by State Farm to deny benefits to

Smart were reasonable and its ultimate decision was not arbitrary and capricious.

The decision of the district court is affirmed.