**Bernard J. BUSHMAN, Plaintiff,**

v.

**STATE MUTUAL LIFE ASSURANCE COMPANY OF AMERICA n/k/a Allmerica Financial, Defendant.**

No. 96 C 0318.

United States District Court,
N.D. Illinois,
Eastern Division.

Feb. 16, 1996.

Arthur M. Gorov, Berkson, Gorov & Levin Ltd., Chicago, IL, for plaintiff.

Daniel A. Engel, Peterson & Ross, Chicago, IL, for defendant.

## FINAL JUDGMENT ORDER

GETTLEMAN, District Judge.

This action, having been tried upon the facts by the court without a jury on January 31, 1996, on plaintiff's motion for a preliminary injunction pursuant to Fed.R.Civ.P. 65, the court makes the following findings of fact and conclusions of law.

### A. Stipulated Findings of Fact and Conclusions of Law.

The parties have stipulated to the following findings of fact and conclusions of law, which are hereby adopted by the court.

1. The plaintiff was at relevant times covered under an employee welfare benefit plan ("the plan") established and maintained by his employer Continental Glass & Plastic, Inc. ("Continental Glass") under the Employee Retirement Income Security Act ("ERISA") (29 U.S.C. § 1001, et seq.). Coverages under the plan were provided by ALLMERICA under Plan Number GP–26232, effective April 1, 1995. The Certificate issued under the plan ("the Certificate") provides, in relevant part, as follows:

—No benefits are payable for charges for any care, treatment, services or supplies, whether or not recommended or prescribed by a doctor, that are any of the following:

· educational, experimental or investigational in nature. In making this determination, we will take into consideration appropriate factors, including but not limited to:

—whether or not the procedure is in a specific phase of research or clinical trial. No benefits will be payable if the covered person is participating in a Phase I or Phase II Study or Clinical Trial. However, benefits will be payable if the covered person is participating in a randomized Phase III Study sponsored by and subject to the protocols of the National Cancer Institute;

—the protocol document;

—the informed consent document; and

\* \* \* \* \* \*

· not approved for reimbursement under Medicare and/or Medicaid or any similar state program.

—No benefits are payable for any care, treatment, services or supplies for or related to bone marrow transplants, except for the following:

· high and intermediate grade, non-Hodgkin's lymphoma, second remission;

· Hodgkin's lymphoma, second remission;

· neuroblastoma, in advanced stage in children;

- acute lymphocytic leukemia following second or subsequent remissions;
- acute non-lymphocytic leukemia in first or second remissions;
- chronic myelogenic leukemia;
- acute myelogenic leukemia in first and second remission;
- aplastic anemia;
- Fanconi's syndrome in children;
- infantile malignant osteopetrosis;
- thalassemia major;
- Wiskott–Aldrich syndrome; and
- severe combined immuno deficiency syndromes.

2. The plaintiff has been proposed to receive high dose chemotherapy ("HDC") treatment for non-Hodgkin's lymphoma. HDC treatment generally falls into two categories, autologous treatment and allogeneic treatment. Autologous treatment involves the harvesting and reinfusion of stem cells from the patient himself or herself; allogeneic transplant involves the harvesting and reinfusion of stem cells from a donor other than the patient.

3. HDC with an autologous transplant involves either high dose chemotherapy with autologous bone marrow transplantation ("HDC/ABMT") or high dose chemotherapy with peripheral stem cell rescue ("HDC/PSCR"). HDC with allogeneic treatment may also be either high dose chemotherapy with allogeneic bone marrow transplantation ("HDC/AlloBMT") or high dose chemotherapy with peripheral stem cell rescue. In either case, the manner of harvesting stem cells is the same as that with respect to an autologous transplant, except that the stem cells are harvested from a donor.

4. Regardless of whether the transplant is autologous or allogeneic, the HDC treatment is essentially the same. First, stem cells are harvested from the patient or from a donor and are frozen in a process known as cryopreservation. The patient is then given doses of chemotherapy that would otherwise be lethal because of their myeloblative—bone marrow destroying—effect. Once the chemotherapeutic agents naturally wash themselves from the patient's system, the stem cells are reinfused, where they home in to bone marrow spaces in the body, regenerate bone marrow, and restore hematopoiesis—blood producing capability.

5. Lymphoma is a malignancy of the lymphoid cells in lymph nodes; it may be originally sitused in lymph nodes almost anywhere in the body, such as in the neck, an armpit, the chest, the abdomen, the brain, or the thigh. Lymphomas are generally in two categories, Hodgkin's lymphoma—of which there are a number of different patterns—and non-Hodgkin's lymphoma—of which there are more than 20 variations and the cause of which is unknown. Non–Hodgkin's lymphoma is typically categorized as low grade, intermittent grade, or high grade. Low grade non-Hodgkin's lymphoma is the most indolent—slowest developing—lymphoma but, also, the most difficult to treat and is often the least responsive to chemotherapy. Low grade non-Hodgkin's lymphoma is a diagnosis distinct from intermediate or high grade non-Hodgkin's lymphoma.

6. The plaintiff, a 55–year old male, noticed a lump in his left axilla—armpit—that persisted for two weeks. In April, 1995, as a result of a March 30, 1995 left axillary lymph node biopsy, the plaintiff was diagnosed with low grade non-Hodgkin's lymphoma. A bone marrow biopsy on April 13, 1995 showed evidence of bone marrow involvement. Since the diagnosis, the plaintiff has been treated by way of standard chemotherapy under the care of Dr. Stephanie Gregory at Rush–Presbyterian St. Luke's Medical Center ("Rush").

7. The plaintiff was originally proposed for HDC/PSCR treatment at Rush, under Rush Protocol 93–T08 entitled "Myeloblative Therapy and Hematopoietic Stem Cell Transplantation for Low–Grade Lymphoma." However, because physicians at Rush were unable to harvest a sufficient number of stem cells from the plaintiff's peripheral blood, HDC/PSCR treatment is not feasible. Therefore, the plaintiff has very recently been proposed to undergo HDC/AlloBMT treatment at Rush, under Rush Protocol 93–T08 entitled "T–Cell Depleted Allogeneic Bone Marrow Transplantation for Patients with Acute and Chronic Leukemia, Lymphoma, and Multiple Myeloma."

8. The plaintiff's HDC/AlloBMT treatment would be part of a "clinical trial," or human subject research. A clinical trial is monitored by an institutional review board ("IRB"), or a similar federally mandated institution, the purpose of which is to protect those patients participating in human subject research. Rush's IRB is called the "Human Investigation Committee."

9. Treatment under a clinical trial is given in accordance with an IRB-approved protocol, which sets forth how the research will be done, what the research investigators are looking for, which patients are eligible to participate, and the number of patients necessary to complete the study. Protocols also have objectives that raise questions to which the researchers do not know the answers.

10. Each person participating in a clinical trial must sign an IRB-approved informed consent. The informed consent goes into great detail as to the type of treatment to be given and its risks, so that patients know exactly the treatment they will be given and their rights once they enter as participants under the protocol.

11. Clinical trials with respect to HDC treatment are typically divided into three phases, Phase I, Phase II, and Phase III. A Phase I clinical trial is often called a "dose escalating" trial and is designed to determine the maximum tolerable chemotherapeutic doses that can be given to patients before the patients experience unacceptable toxicities— side effects. Once the maximum tolerable doses of the chemotherapeutic agents are determined, a Phase II study may be conducted to determine the safety and efficacy of the proposed treatment on patients with a specific disease or disease category, such as hematologic cancers—leukemias and lymphomas. If treatment under Phase II studies shows promise, a Phase III study may be conducted, which is a randomized study to determine conclusively that the proposed treatment is safe and effective.

12. The Rush protocol under which the plaintiff would receive his HDC/AlloBMT treatment is part of a Phase II clinical trial. The "Principal Investigators" under the protocol are Dr. J.M. Feingold and Dr. Herbert Kaizer. The investigators' objectives under the protocol are: (1) "[t]o assess the response rate, duration of response, event-free survival and survival of patients treated with myeloblative therapy and bone marrow transplantation"; (2) "[t]o assess the number of patients achieving durable hematologic reconstitution"; (3) "[i]ncidents and characteristics of peri-transplant morbidity and mortality ..."; (4) "[c]haracteristics of hematopoietic and immunologic reconstitution, including late hematologic and infectious complications"; and (5) "[a]ssess the degree of GVHD [graft-versus-host-disease] with T-Cell depleted donor bone marrow."

13. If the plaintiff were to participate in the Rush Phase II clinical trial, he would be obligated to sign a Rush Human Investigation Committee-approved informed consent. That consent states: "You are asked to participate in a study involving the use of intensive anticancer therapy and bone marrow transplantation (BMT) in the treatment of your disease." It further states that "[p]articipation in the this study involves an average of 6 to 8 weeks of hospitalization" and that "[t]here is substantial discomfort and risk of dying from the side effects of the treatment." In the "confidentiality" section, the informed consent states that "[y]our records will be made available to other physicians for the purpose of evaluating the results of this study."

14. According to the testimony of Dr. Kaizer, the plaintiff would not be given either HDC or an AlloBMT without the other. Dr. Kaizer testified, and ALLMERICA independently concluded, that the proposed HDC is related to the AlloBMT.

15. ALLMERICA originally received a request for precertification of HDC/PSCR treatment under Rush Protocol 93–T08. In investigating this precertification request, ALLMERICA obtained various records, including the plaintiff's medical records and the protocol and informed consent under Rush Protocol 93–T08. Consistent with the language of the Certificate, and based upon its review of the records obtained, ALLMERICA denied the plaintiff's precertification request by letter dated October 19, 1995.

16. On November, 10, 1995, David Adams of ALLMERICA documented a suggestion that a representation may have been made by some unspecified person(s) that the ALLMERICA coverage would be similar to the coverage of Trustmark Insurance Company ("Trustmark"), the plan's prior group insurer. As a follow up, ALLMERICA obtained a December 5, 1995 memorandum from Craig Chisholm, the ALLMERICA representative who sold the ALLMERICA coverage to Continental Glass, in which Mr. Chisholm stated that "I know it was BLU's [one of Continental Glass' brokers] intent to match benefits as close as possible" but that "I told Bernie [the plaintiff] that no two companies have the same contract language."

17. Later, ALLMERICA received a December 8, 1995 memorandum from Michael Loden of BLU to Mr. Chisholm. Mr. Loden wrote that "[a]t the time I presented the ALLMERICA quote to Bernie, I explained that we had basically duplicated the plan benefits ..." and that "[a]t the employee enrollment meetings the State Mutual Benefit plan was highlighted and plan benefits were presented to be the same, or perhaps better, when it came to deductibles, co-pays and out-of-pockets." Mr. Loden concluded that "[t]here was never a pledge made that the contracts were identical."

18. On December 15, 1995, ALLMERICA received a December 14, 1995 letter from the plaintiff. The plaintiff stated in the letter that "I as the representative of Continental Glass & Plastic, Inc. (CGP) directed the two insurance brokers to only present health insurance proposals equal to or better than the company's then program with Trustmark ..." and that "[o]n April 3, 1995 at the CGP employee meeting to roll out the new group health insurance program, Mr. Michael Loden of BLU Benefits Group Inc. (the other insurance broker) informed the attendees that the State Mutual policy was equal to or better than the predecessor policy." The plaintiff discussed in the letter his dealings with Mr. Chisholm and the fact that he had informed Mr. Chisholm of a possible lymphoma diagnosis. The plaintiff claimed that, in response to this advise, Mr. Chisholm said he could still write the policy and that Mr. Chisholm did not advise of any bone marrow transplant exclusions.

19. ALLMERICA sent a December 21, 1995 letter to the plaintiff, in response to the plaintiff's allegations "that certain representations were made to you during the sale of this insurance policy." In analyzing the representations issue, and in discussing the words "Medically Necessary" under both the Certificate and the Trustmark certificate, ALLMERICA stated in the letter as follows:

> By virtue of the lack of information and ongoing studies involved with regard to your particular condition as it relates to a bone marrow transplant, as well as the medical documentation we have including the informed consent document, it is our position that this procedure, if performed, would be part of a medical research procedure, is experimental and is not the current "standard of care" in that it is still in the investigational stages. Thus, it would not meet the definition of Medically Necessary as it is defined by both the Trustmark policy and the Allmerica policy.
>
> Be that as it may, we do not intend to argue the issues of "medical necessity", "experimental" and "investigational". In 1993 Allmerica amended its standard contract language to clarify the specific bone marrow transplant procedures that would be covered under our policies in order that we avoid issues pertaining to the term "experimental". As we have noted in our prior letters, your policy contains a specific exclusion for bone marrow transplants unless they are contained in the covered procedures list.

Debra Schempp testified that it was not ALLMERICA's intent by the letter to waive any rights or defenses that ALLMERICA had, including those with respect to the Certificate provisions upon which ALLMERICA had twice previously denied the plaintiff's precertification request.

20. Sheila M. Davies of Rush sent a December 11, 1995 letter, informing ALLMERICA that the plaintiff did not qualify for his originally proposed HDC/PSCR treatment; that one of the plaintiff's two sibling an HLA identical match; that "[o]ur plan for Bernard is to present him with the risks and benefits

of an allogeneic bone marrow transplant today"; and that she believed that he would want to proceed with the allogeneic bone marrow transplant.

21. On December 14, 1995, ALLMERICA sent a letter to the plaintiff confirming the precertification denial made on October 19, 1995 with respect to HDC/PSCR. ALLMERICA advised in the letter that "[w]e are sorry to advise you that benefits are not available for an allogeneic bone marrow transplant under the terms of the policy under which you are covered." In denying precertification, ALLMERICA quoted the same three Certificate provisions as are at issue in now, including the exclusion for treatment "not approved for reimbursement under Medicare."

22. On January 16, 1996, the plaintiff's counsel sent two letters to ALLMERICA requesting that ALLMERICA reconsider its precertification denials and specifically making claim for precertification with respect to the proposed HDC/AlloBMT treatment. The plaintiff's counsel enclosed with one of the January 16, 1996 letters a letter to the plaintiff from Charles T. McEwen, Trustmark's Second Vice President of Group Marketing, stating:

> For reference, I attach a copy of a letter received from Mel Banks in regards to your current situation with Allmerica Life. I have had our claims department review this and their response is one of a positive nature.
>
> Although bone marrow transplants for many conditions are considered experimental, Trustmark does not consider it to be experimental for this particular type of Cancer based upon the information available to us at this time.

23. Also, the plaintiff's counsel sent with one of his January 16, 1996 letters to ALLMERICA a voluminous package of documents. These documents included medical records, Rush Human Investigation Committee-approved clinical trial documents, and the Trustmark certificate. The documents confirm that, because the plaintiff did not qualify under Protocol 93–T08, the plaintiff was proposed to receive HDC/AlloBMT treatment under Rush Protocol 93–T07. Because

ALLMERICA did not receive this documentation until after the plaintiff brought his action for injunctive relief, ALLMERICA quickly renewed its investigation, one that, nonetheless, resulted in the same claim determination as was made when ALLMERICA was informed that the plaintiff sought precertification for HDC/PSCR treatment.

24. During its investigation, ALLMERICA spoke with and obtained written analyses from two board certified oncologists, Dr. Mary Sheila Donnelly and Dr. Richard Grapski. First, both Dr. Donnelly and Dr. Grapski were asked whether the plaintiff's proposed HDC/AlloBMT treatment was one of the listed conditions for which bone marrow transplantation treatment would be covered under the Certificate; both answered "no." Both Dr. Donnelly and Dr. Grapski were also quoted language from HCFA Guidelines as to whether Medicare provides reimbursement for HDC/AlloBMT treatment for non-Hodgkin's lymphoma; Dr. Donnelly stated that the plaintiff's proposed HDC/AlloBMT treatment did not fall within the guidelines, and Dr. Grapskis' answer was non-responsive. Dr. Donnelly was asked whether the proposed HDC/AlloBMT treatment was "a Phase I or Phase II study/clinical trial"; she responded that "[t]echnically this is phase 2 study...."

25. Also during its investigation, ALLMERICA reviewed HCFA guidelines on Medicare reimbursement. The HCFA guidelines state that Medicare provides reimbursement for HDC/AlloBMT treatment only for leukemia, leukemia in remission, and aplastic anemia; they do not provide for reimbursement for HDC/AlloBMT for lymphomas, or specifically for non-Hodgkin's lymphoma.

26. By letter dated January 29, 1996, ALLMERICA denied the plaintiff's request for precertification of his proposed HDC/AlloBMT treatment. It concluded under the language of the Certificate that: (1) the plaintiff's proposed treatment was not for high and intermediate grade, non-Hodgkin's lymphoma, second remission, but, rather, was for low grade non-Hodgkin's lymphoma, without second remission, and, therefore, was excluded as treatment for or related to bone

marrow transplants; (2) because the plaintiff would be participating in a Phase II clinical trial, his proposed treatment was educational, experimental or investigational in nature and, therefore, excluded under the Certificate; and (3) the plaintiff's proposed treatment was "not approved for reimbursement under Medicare and/or Medicaid ..." and, therefore, was excluded under the Certificate.

27. Additionally, with respect to the question of what Trustmark would or would not have covered, ALLMERICA advised in its January 29, 1996 letter as follows:

> While we maintain that neither Douglas S. Winer of Jardine Insurance Brokers Illinois, Inc. nor Michael Loden of B.L.U. Benefits Group are "agents" of Allmerica, we will address the issue of whether Trustmark would have provided benefits for this transplant under the prior plan. We have reviewed the Trustmark policy for Continental Glass & Plastic as well as the letter dated January 4, 1996 from Charles T. McEwen, Second Vice President of Marketing for Trustmark. Mr. McEwen's letter was somewhat vague with respect to the information that he presented to the claim department for review. We have been in contact with David Backe, Second Vice President of the claim department and Debra Smart, M.D., the Trustmark Medical Director. We provided them with the Protocol Document 93–T07, Informed Consent document, copies of our physician consultant reviews, and the HCFA guidelines. Following their review of these documents we spoke with them to discuss whether or not Trustmark would provide coverage under their policy.

> During our discussion they indicated that the controlling contract language would be that contained in the Trustmark Certificate Rider (for Continental Glass) whereby benefits will be paid only for "Medically Necessary" care. The term "Medically Necessary" means: "drugs, therapies or other treatments that are required and appropriate for care of the Sickness or the Injury; that are given in accordance with generally accepted principles of medical practice in the U.S. at the time furnished; and that are reimbursed

by medicare; and that are not deemed experimental, educational or investigational in nature by any appropriate technological assessment body established by any state or federal government; and that are not furnished in connection with medical or other research."

> While they indicated that they did not have the full benefit of having Mr. Bushman's complete medical file, based upon the documentation they reviewed it was their feeling that the proposed allogeneic bone marrow transplant was not "medically Necessary" as it appeared:

1. to be furnished in connection with medical research;

2. not to be covered by the HCFA guidelines for Medicare reimbursement; and

3. not to be medically appropriate.

## CONCLUSIONS OF LAW

1. The parties have stipulated that an arbitrary and capricious standard of review applies to ALLMERICA's precertification denial. Under this standard, the court must uphold the claim decision if the claim administrator "makes an informed judgment and articulates an explanation that is satisfactory in light of the relevant facts, i.e., one that makes a 'rational connection' between the issue to be decided, the evidence in the case, the text under consideration, and the conclusion reached...." *Exbom v. Central States, Southeast and Southwest Areas Health and Welfare Fund,* 900 F.2d 1138, 1143 (7th Cir.1990), citing *Smart v. State Farm Ins. Co.,* 868 F.2d 929, 936 (7th Cir. 1989). In determining whether a claim determination was arbitrary and capricious, the court is to focus on the information and evidence before the claim adjudicator at the time of its final decision. *Donato v. Metropolitan Life Ins. Co.,* 19 F.3d 375 (7th Cir. 1994); *Wolfe v. J.C. Penney Co., Inc.,* 710 F.2d 388 (7th Cir.1983). Moreover, where a claim administrator has equally plausible but conflicting facts as to whether a particular claim is entitled to coverage, it is not arbitrary and capricious for the claim administrator to conclude that the claim is not covered. *See Donato v. Metropolitan Life Ins. Co.,* 19

F.3d 375 (7th Cir.1994). *See also Hill v. Trustmark Ins. Co.,* No. 6:96 CV 50 (E.D.Tex. January 31, 1996).

■ 2. In order to obtain injunctive relief, a plaintiff must prove, among other things, a likelihood of success on the merits. *Ping v. National Education Ass'n,* 870 F.2d 1369 (7th Cir.1989). Consequently, consistent with the foregoing standard of review, the plaintiff here has the burden of proving a likelihood of success on the merits in showing that ALLMERICA's precertification denial was arbitrary and capricious.

■ 3. Waiver is a voluntary and intentional relinquishment of a known right and arises from a unilateral, affirmative act by the insurer. *Loyola University of Chicago v. Humana Ins. Co.,* 996 F.2d 895, 901 (7th Cir.1993). The party claiming waiver has the burden of proving, by evidence that is "clear, precise, and unequivocal," that the "insurer's words or conduct were inconsistent with an intent to rely on the provisions of the policy." *Id.*

### B. *Additional Findings of Fact and Conclusions of Law*

The court makes the following additional findings of fact and conclusions of law.

1. The HDC/AlloBTM procedure prescribed for plaintiff costs several hundred thousand dollars or more in hospital and medical charges. Rush will not perform the procedure without a $175,000 deposit from or on behalf of plaintiff, a sum which the parties agree plaintiff cannot afford to pay.

■ 2. Defendant's December 21, 1995, letter contains a waiver of the issues of whether the HDC/AlloBTM procedure prescribed for plaintiff is a "medical necessity," "experimental" or "investigational." The language of the letter unequivocally constitutes an intentional relinquishment of a known right. The intent of the letter is clear: because defendant believed the policy at issue contained, as the letter states, "a specific exclusion for bone marrow transplants unless they are contained in the covered procedures list," defendant decided there was no need to rely on these issues. Accordingly, the court will not discuss or rely on the issues of exclusion based on whether the procedure is a medical necessity, experimental or investigational.

3. The policy pays benefits only for bone marrow transplants and related treatment for high and intermediate grade non-Hodgkins lymphoma, second remission. (Stipulated Finding No. 1, p. 2 above.) The policy language thus clearly and unambiguously excludes benefits for a bone marrow transplant for the illness suffered by plaintiff, low grade non-Hodgkins lymphoma. It is also plain from the evidence that plaintiff has not achieved a second remission. Thus, even if plaintiff suffered from high or intermediate grade non-Hodgkins lymphoma, the exclusion would apply. Because it is uncontested that the bone marrow transplant prescribed for plaintiff by his physician is "related to" the high dose chemotherapy, neither facet of the procedure is covered by defendant's policy.

■ 4. Plaintiff has attempted to avoid the policy exclusions by arguing that defendant is bound to cover the prescribed treatment for a number of reasons:

A. First, plaintiff alleges that defendant's representative, Mr. Chisholm, represented that defendant's policy was "equal to or better than" the Trustmark policy that covered Continental Glass employees such as plaintiff prior to the effective date of defendant's policy. Plaintiff cannot prevail on this argument, however, because he has failed to demonstrate that Trustmark would have paid benefits for this treatment. The letter from Mr. McEwen, Trustmark's second vice president of group marketing, is unpersuasive. He apparently has no authority to approve claims, and there is contradictory evidence from David Backe, Trustmark's second vice president of claims, as well as Dr. Deborah Smart, Trustmark's medical director.

Moreover, the notion that defendant's policy is "equal to or better than" Trustmark's is too vague to be enforced in the manner sought by plaintiff. Michael Loden, a broker involved in procuring the new health insurance on behalf of Continental Glass, stated in a December 8, 1995,

memorandum to defendant that defendant's policy was represented at employee enrollment meetings to be "the same, or perhaps better, when it came to deductibles, co-pays and out-of-pockets." No other comparison of policy provisions was demonstrated to the court, and it appears that Trustmark's policy excludes benefits for procedures it regards as experimental or not "medically necessary," as does defendant's policy. The Trustmark policy, like defendant's, also refers to Medicare coverage as an indicia of whether a procedure is medically necessary. The evidence therefore establishes a close similarity, if not an identity of coverage between Trustmark's and defendant's policies with respect to the procedures at issue in this case.

B. Plaintiff also faults defendant for not having sent Continental Glass the actual policy for more than three months after it was in effect. While the court agrees that this was unwise on everyone's part, plaintiff has failed to articulate how this delay affected the terms of coverage. If, as plaintiff claims, he would have rejected defendant's policy had he known its terms, he would have been covered by the Trustmark policy which, as previously noted, did not cover the HDC/AlloBMT treatment.

C. Finally, plaintiff alleges that the fact that Mr. Chisholm was told on March 31, 1995, that plaintiff had been initially diagnosed with lymphoma on the preceding day should compel defendant to pay for the bone marrow transplant treatment. Again, plaintiff cannot show how he was damaged by this event. On March 31, 1995, when plaintiff signed up for defendant's policy on behalf of Continental Glass, both plaintiff and defendant were aware that plaintiff likely had lymphoma, but were not aware of the type of lymphoma or the treatment that might be prescribed for it. Defendant did not treat plaintiff as having a pre-existing condition that would exclude him from coverage or limit his benefits in any way. Indeed, defendant has paid more than $60,000 for plaintiff's conventional chemotherapy treatment, and will continue to pay benefits for such treatment that is not excluded under the policy. Although there was some confusion at trial as to what policy provision was being applied to plaintiff under the coverage provided by defendant, it is clear to the court that defendant did not penalize plaintiff for having been diagnosed with lymphoma the day before the effective date of the policy.

5. Because the parties have stipulated that there would be no additional evidence other than that presented at the January 31, 1996, hearing, and because that evidence does not demonstrate that defendant's decision to deny benefits was arbitrary and capricious under the terms of the policy, defendant is entitled to final judgment in this matter pursuant to Fed.R.Civ.P. 65(a)(2).

6. That being said, the court cannot help but note that this result appears to be unjust, unwise and unreasonable. Although health insurance coverage is a matter of contract between the parties, it seems nonsensical to this court that anyone would knowingly purchase health insurance that would not cover a potentially life-saving procedure such as that involved in this case. We buy health insurance to protect us if we get sick or injured. We usually do not read the fine print of the policies unless and until we need medical services. Insurers such as defendant should provide benefits for all reasonable medical services, and should explain exclusions, such as the one at issue in this case, before, not after, an insured signs up for coverage.

There are two facts in this case that are brutally shocking to this court. First, the procedure at issue is not some type of voodoo or alternative medicine prescribed by someone outside the mainstream of medical practice. To the contrary, it is being prescribed by the head of a major department of a highly respected medical institution. Second, defendant's policy will pay large amounts of money for conventional chemotherapy treatment, which according to the evidence will ultimately prove to be futile. It will not, however, pay for the bone marrow transplant which apparently holds the only hope—however slim—for plaintiff's long term survival. This paradox is nonsensical, shortsighted, and cruel. Today's experiment

may well be tomorrow's cure. Should plaintiff be unable to raise the necessary funds to have this treatment, and succumb to this terrible illness as a result, defendant and the people who run it and make these decisions will have their consciences to live with.

The conscience of the court, however, is guided by the law, and not by the economic motives which apparently drive health insurance carriers such as defendant. Other judges have expressed the sadness and frustration that results from following legal principles that deny health benefits in cases like this. *See, Fuja v. Benefit Trust Life Ins. Co.,* 18 F.3d 1405 (7th Cir.1994); *Harris v. Mutual of Omaha Cos.,* 1992 WL 421489 (S.D.Ind.1992). If there were some way within the law to avoid the conclusion reached by the court, the court would be only too happy to oblige. Unfortunately, no such solution presents itself, and judgment is hereby entered for defendant.