United States Court of Appeals,

Eleventh Circuit.

Nos. 92-9121, 94-8760, 96-9503, 93-8056 and 97-8032.

ATLANTA GAS LIGHT COMPANY, Petitioner,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent.

AMERICAN GAS ASSOCIATION, Petitioner,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent.

BOARD OF WATER, LIGHT AND SINKING FUND COMMISSIONERS OF THE CITY OF
DALTON, GEORGIA, Petitioner,

v.

FEDERAL ENERGY REGULATORY COMMISSION, Respondent.

May 14, 1998.

Petitions for Review of Orders of the Federal Regulatory Commission. (FERC), Nos. 61,207,
61,183, FERC-CP90-1391-00, CP90-1391-003, CP90-1391-006.

Before BARKETT, Circuit Judge, and GODBOLD and GOODWIN[*], Senior Circuit Judges.

BARKETT, Circuit Judge:

In this consolidated appeal, appellants Atlanta Gas Light Co. ("Atlanta Gas"), the American

Gas Association ("AGA"), and the Board of Water, Light and Sinking Fund Commissioners of the

City of Dalton, Georgia ("Dalton"), seek judicial review of four related orders issued by the Federal

Energy Regulatory Commission ("FERC" or "the Commission") between 1991 and 1996. These

---

[*]Honorable Alfred T. Goodwin, Senior U.S. Circuit Judge for the Ninth Circuit, sitting by
designation.

orders involved the attempt, ultimately successful, of Arcadian Corporation ("Arcadian") to obtain natural gas directly from Southern Natural Gas Company, ("Southern"), thereby obviating the need to purchase it from Atlanta Gas.

Arcadian uses natural gas to produce anhydrous ammonia for fertilizer at a plant in Augusta, Georgia. The plant was built by its corporate predecessor near Southern's mainline system in order to obtain the most direct natural gas service available. *See Arcadian Corp. v. Southern Natural Gas Co.,* [April-June 1991 Transfer Binder] Fed. Energy Reg. Comm'n Rep. (CCH) ¶ 61,207, at 61,683. Southern provides service directly to end-use customers as well as to wholesale local distribution companies ("LDCs") like Atlanta Gas which, in turn, sells gas at retail. Beginning in 1963, Arcadian's predecessor, and later Arcadian, purchased gas for the plant from Southern's largest LDC customer, Atlanta Gas. In 1990, however, Arcadian sought direct service from Southern which would have necessitated the construction of approximately 140 feet of connecting pipeline to physically link Arcadian's plant with Southern's pipeline. Southern refused, and Arcadian filed a complaint with FERC alleging that by refusing its request for direct service while providing such service to other end-users (including Arcadian's competitors), Southern had violated the anti-discrimination provisions of the Natural Gas Act, 15 U.S.C. § 717, et seq. (1994) ("NGA" or "the Act").

Arcadian requested that the Commission order Southern to construct the interconnection facilities for the direct link to the pipeline. Southern opposed this request, contending that its decision not to provide direct service to Arcadian was a business decision that did not violate the

2

NGA or its tariff.[1]  Atlanta Gas, among others,[2] intervened in the law suit and argued that § 5 of the NGA did not authorize the Commission to compel Southern to construct facilities or to provide transportation service to an individual end-user.  The Commission ruled that although it had the authority to grant the relief sought under § 5 of the NGA, Southern had not discriminated against Arcadian.  *Arcadian Corp. v. Southern Natural Gas Co.,* [April-June 1991 Transfer Binder] Fed. Energy Reg. Comm'n Rep. (CCH) ¶ 61, 207 ("1991 Order").  On rehearing, FERC reaffirmed its authority to grant the relief sought under § 5 of the NGA, but reversed its earlier decision that Southern had not discriminated and ordered Southern to provide direct service to Arcadian and to submit tariff sheets which would govern future requests for direct connection by other end-users like Arcadian.  *Arcadian Corp. v. Southern Natural Gas Co.,* [October-December 1992 Transfer Binder] Fed. Energy Reg. Comm'n Rep. (CCH) ¶ 61, 183 ("1992 Order").

While Southern, Atlanta Gas and AGA sought reconsideration of the 1991 and 1992 Orders, Southern built the interconnection facility mandated by the 1992 Order, and then, in 1993, entered into a settlement in which it agreed to service Arcadian under a requirements contract and Arcadian agreed to drop its complaint.  Atlanta Gas, AGA, and Dalton opposed the settlement, as well as the proposed tariffs Southern submitted to the Commission.  Nonetheless, the Commission approved the settlement and Southern's proposed tariffs for end-users and terminated Arcadian's complaint proceeding.  *Arcadian Corp. v. Southern Natural Gas Co.,* [April-June 1994 Transfer Binder] Fed.

---

[1]A tariff is the "contract which governs a pipeline's service to its customers." *ANR Pipeline Co. v. FERC,* 931 F.2d 88, 90 n. 1 (D.C.Cir.1991).  It contains a listing of the pipeline's rate schedules and the terms of its service agreements with customers.  18 C.F.R. § 154.2(b) (1994).

[2]AGA intervened alongside Atlanta Gas. As AGA joins in almost every position advanced by Atlanta Gas in this appeal, for simplicity's sake, we refer throughout this opinion only to the arguments of Atlanta Gas.

Energy Reg. Comm'n Rep. (CCH) ¶ 61, 176 ("1994 Order"). Atlanta Gas sought rehearing of the 1994 Order on the grounds that FERC had not held an adequate hearing on the effects of the settlement, that its decision was not rational, and that even if the settlement was approved, the 1992 Order should be vacated. Dalton challenged FERC's approval of the tariffs.

While these petitions were pending, Southern submitted to the Commission, on March 15, 1995, a proposed settlement ("Global Settlement") it had entered with Atlanta Gas, among others, to resolve numerous outstanding rate and certificate cases. Certain terms of the Global Settlement dealt with the Southern-Arcadian bypass, including the agreement of Atlanta Gas to withdraw its claims that the Southern-Arcadian bypass was discriminatory.[3] The Commission thus stayed the rehearing requests filed in response to its 1994 Order pending final action on the Global Settlement. After subsequently approving the Global Settlement in *Southern Natural Gas Co.,* [July-September 1995 Transfer Binder] Fed. Energy Reg. Comm'n Rep. (CCH) ¶ 61,322, the Commission issued the fourth and final order under review here denying the petitions for rehearing of its 1994 Order on November 26, 1996. *Arcadian Corp. v. Southern Natural Gas Co.,* [October-December 1996 Transfer Binder] Fed. Energy Reg. Comm'n Rep. (CCH) ¶ 61, 210 ("1996 Order"). This Court consolidated for appeal the multiple petitions seeking review of these four FERC orders.

DISCUSSION

A. *Statutory and Regulatory Background*

---

[3]The relevant portion of the settlement reads: "Atlanta ... agree[s] to withdraw, in all pending ... judicial proceedings, and to refrain from asserting in any future proceedings ..., any and all price squeeze and discrimination claims relating to the direct service by Southern to Arcadian ... pursuant to [their November 1993 settlement]...." March 15, 1995 Stipulation and Agreement, Docket Nos. RP89-224, et al., Article XII, ¶ 9, *quoted in Arcadian Corp.,* [October-December 1996 Transfer Binder] Fed. Energy Reg. Comm'n Rep. (CCH) at 61,856.

4

A brief discussion of the organization of the industry and the regulatory framework governing its participants helps set the scene for the case at bar. The Supreme Court recently undertook such a summary of the "evolution of the structure of the natural gas industry" in *General Motors Corp. v. Tracy,* 519 U.S. 278, ----, 117 S.Ct. 811, 816, 136 L.Ed.2d 761 (1997). As the Court explained:

> Traditionally, the industry was divisible into three relatively distinct segments: producers, interstate pipelines, and LDCs. This market structure was possible largely because the Natural Gas Act of 1938 failed to require interstate pipelines to offer transportation services to third parties wishing to ship gas. As a result, interstate pipelines were able to use their monopoly power over gas transportation to create and maintain monopsony power in the market for the purchase of gas at the wellhead and monopoly power in the market for the sale of gas to LDCs. For the most part, then, producers sold their gas to the pipelines, which resold it to utilities, which in turn provided local distribution to consumers.

> Congress took a first step toward increasing competition in the natural gas market by enacting the Natural Gas Policy Act of 1978, which was designed to phase out regulation of wellhead prices charged by producers of natural gas, and to "promote gas transportation by interstate and intrastate pipelines" for third parties. Pipelines were reluctant to provide common carriage, however, when doing so would displace their own sales, and in 1985, [FERC] took the further step of promulgating Order No. 436, which contained an "open access" rule providing incentives for pipelines to offer gas transportation services. In 1992, this evolution culminated in FERC's Order No. 636, which required all interstate pipelines to "unbundle" their transportation services from their own natural gas sales and to provide common carriage to buyers from other sources that wished to ship gas.

> Although FERC did not take the further step of requiring interstate pipelines to provide local transportation services to insure that gas sold by producers and independent marketers could get all the way to the point of consumption, under the system of open access to interstate pipelines that had emerged in the mid-1980s "larger industrial end-users" began increasingly to bypass utilities' local distribution networks by "construct[ing] their own pipeline spurs to [interstate] pipelines...."

*Id.* at ---- - ----, 117 S.Ct. at 816-17 (internal citations omitted; some brackets in original).

This case involves disputes arising from precisely this point in the deregulatory process. The parties' contentions implicate the regulatory structure established by the NGA. Section 1(b) of the

5

statute, 15 U.S.C. § 717(b), confers upon FERC comprehensive authority over "(1) the transportation of natural gas in interstate commerce; (2) its sale in interstate commerce for resale; and (3) natural gas companies engaged in such transportation or sale." *Panhandle Eastern Pipe Line Co. v. Public Service Com'n of Indiana,* 332 U.S. 507, 516, 68 S.Ct. 190, 195, 92 L.Ed. 128 (1947). In the exercise of its enumerated powers, the Commission regulates market entry of natural gas producers and interstate pipelines through Section 7 of the NGA by issuing certificates of public convenience and necessity authorizing natural gas companies to transport or sell gas and to construct necessary facilities. *See* 15 U.S.C. § 717f(c)(1)(A). In addition, under Sections 4 and 5 of the NGA, the Commission regulates the price and other terms of sales and transportation of natural gas to ensure that the rates and charges for such service, as well as any "rule, regulation, practice, or contract" affecting those rates and charges, are just and reasonable and not the product of undue discrimination. *See* 15 U.S.C. §§ 717c and 717d.

B *Standard of Review*

The standard of review of FERC decisions is governed by § 19(b) of the NGA, which makes the Commission's findings of facts "conclusive" if supported by "substantial evidence." 15 U.S.C. § 717r(b). This standard "is no more than a recitation of the application of the "arbitrary and capricious' standard to factual findings." *Maryland People's Counsel v. Federal Energy Regulatory Comm'n,* 761 F.2d 768, 774 (D.C.Cir.1985) (Scalia, J.). The "arbitrary and capricious" standard hails from the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), which requires us to uphold the Commission's actions, findings, and conclusions unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

The scope of our "arbitrary and capricious" review is "narrow"; we must "not ... substitute [our] judgment for that of the agency," *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983), but rather determine whether there was a " "rational connection between the facts found and the choice made,' " *id.* (quoting *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 245-46, 9 L.Ed.2d 207 (1962)), and examine " "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment,' " *id.* (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974)); *see also Florida Power & Light Co. v. FERC,* 598 F.2d 370, 380 (5th Cir.1979).[4]

C. *The 1994 and 1996 Orders*

There is no question that the settlement between Southern and Arcadian changed the thrust of the litigation in this case. Thus, we first consider the validity of the 1994 and 1996 Orders approving that settlement. In order for the Commission to approve a settlement involving the direct interconnection of an interstate pipeline and an industrial end-user, the terms of the settlement must satisfy the "public convenience and necessity" standard of § 7(e) of the NGA.[5]

---

[4]Cases decided by the Fifth Circuit prior to October 1, 1981 are binding on this Court. *Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir.1981) (*en banc* ).

[5]That provision provides in pertinent part:

> (e) Granting of certificate of public convenience and necessity

> *... a certificate shall be issued* to any qualified applicant therefor, authorizing the whole or any part of the operation, sale, service, construction, extension, or acquisition covered by the application, *if it is found that* the applicant is able and willing properly to do the acts and to perform the service proposed and to conform to the provisions of this chapter and the requirements, rules, and regulations of the Commission thereunder, and that *the proposed service, sale,*

Atlanta Gas challenged the Commission's approval of the settlement, essentially contending that (1) the Commission failed to provide a reasoned justification of the "public convenience and necessity" of the Arcadian bypass;  (2) the Commission failed to hold a full evidentiary hearing, rendering the orders invalid;  (3) the Commission's retroactive authorization of the construction of the bypass failed to adhere to the application procedure for the construction of sales taps;  and (4) even if the Commission appropriately approved the settlement, it should have vacated its 1991 and 1992 Orders.  We address each of these contentions in turn.

### 1. *Rational Decisionmaking*

In its 1994 Order, FERC concluded that the settlement was required by public convenience and necessity because, among other things, it was "in accord with our policy regarding bypass." *Arcadian Corp.,* [April-June 1994 Transfer Binder] Fed. Energy Reg. Comm'n Rep. (CCH) at 61,535.  The Commission delineated its bypass policy in the 1992 Order.  It explained that "[t]he policy allows increased direct access to transportation markets, imposes upon LDCs the need to discipline costs to maintain customers, allows pipelines to compete for markets served inefficiently, provides leverage to parties seeking to obtain services priced efficiently, and assures the benefits of competition to all market participants." *Arcadian Corp.,* [October-December 1992 Transfer Binder] Fed. Energy Reg. Comm'n Rep. (CCH) at 61,680.

Atlanta Gas contends that the Commission may not rely on the general assumption that bypassing LDCs will promote competition and increase the general welfare, but that the Commission

---

*operation, construction, extension, or acquisition,* to the extent authorized by the certificate, *is or will be required by the present or future public convenience or necessity;*  otherwise such application shall be denied.

15 U.S.C. § 717f(e) (emphasis added).

8

must demonstrate that the particular bypass at issue enhances competition. The Commission responded to this argument in its 1996 Order, where it explained that it is neither "necessary or possible" for FERC to demonstrate that "every contract signed for pipeline service "enhances' competition, as opposed to being the result of competitive processes." *Arcadian Corp.,* [October-December 1996 Transfer Binder] Fed. Energy Reg. Comm'n Rep. (CCH) at 61,858. In other words, the Commission's view is that fair competition furthers the public interest in general terms and over time, even though a particular bypass arrangement may contain certain undesirable costs. As the Commission explained, its "policy on bypass rests on the assumption that market forces operating in fair competition will promote the most efficient allocation of supplies and transportation capacity and the expectation that LDCs can and will compete for end-users' business." *Id.* This policy "is not based on an assumption that the bypass will never result in detriment to an LDC or its ratepayers." *Arcadian Corp.,* [April-June 1994 Transfer Binder] Fed. Energy Reg. Comm'n Rep. (CCH) at 61,536. The Commission is well aware that "[i]n any competition ... someone will lose," and that, in this case, "Atlanta has lost the present competition for Arcadian's business—at least for the term of its contract with Southern." *Id.*

The question is whether the Commission's interpretation of its burden in demonstrating "public convenience and necessity" for the purposes of Section 7(e) proceedings is supported by the law. We find that it is. The Commission is an administrative agency charged by Congress with formulating a regulatory plan for the natural gas industry. A court is "not at liberty to replace FERC's economic reasoning, supported by its technical expertise, with [its] own." *Michigan Consolidated Gas Co. v. FERC,* 883 F.2d 117, 123 (D.C.Cir.1989). FERC acknowledges that its bypass policy is based on several economic assumptions about the way the market for natural gas

9

as a whole will perform. It is well within the Commission's discretion to make such "predictions" so long as they are " 'rationally based on record evidence.' " *Id.* at 124 (quoting *East Tennessee Natural Gas Co. v. FERC,* 863 F.2d 932, 938-39 (D.C.Cir.1988)).

The only support Atlanta Gas provides for its assertion that the Commission must show that each bypass produces a net gain for all parties concerned is *Electricity Consumers Resource Council v. FERC,* 747 F.2d 1511, 1517 (D.C.Cir.1984) ("*ELCON* "). In *ELCON* the D.C. Circuit rejected the Commission's approval of a power company's marginal pricing rate design because the Court found that FERC had merely relied on an economic theory of ratemaking which, in fact, had not been applied in that case. *Id.* at 1514, 1517-18. The Court held that "mere invocation of theory is an insufficient substitute for substantial evidence and reasoned explanations." *Id.* at 1517. Atlanta Gas embraces this statement and contends that it reflects what FERC has done in this case as well. Yet the *ELCON* holding is narrower than Atlanta Gas admits, and FERC has provided a reasoned explanation of its decisions in this case.

First, the Court in *ELCON* was careful to note that it was not condemning the use of economic theory per se, but only reliance on theory where there was no "basis for its adoption in th[e] [particular] case." *ELCON,* 747 F.2d at 1518; *see also Associated Gas Distribs. v. FERC,* 824 F.2d 981, 1008 (D.C.Cir.1987) (construing *ELCON* to apply in cases in which FERC " 'inexplicably distorted' the theory that it claimed to apply") (quoting *ELCON,* 747 F.2d at 1514). Moreover, the D.C. Circuit has distinguished the more complex economic theory at issue in *ELCON* from the "general factual prediction" that competition will lead to lower prices. *Associated Gas Distribs.,* 824 F.2d at 1008 ("Agencies do not need to conduct experiments in order to rely on the prediction that

10

an unsupported stone will fall, nor need they do so for predictions that competition will normally lead to lower prices.").

Second, FERC provided reasoned rejections of Atlanta Gas's allegations that the bypass in this case was inconsistent with the public interest. Atlanta Gas had argued that, as a result of this bypass, it and its remaining customers would be harmed. Through affidavits Atlanta Gas predicted its own lost revenues and attempted to forecast the rates it would have to charge other consumers if more industrial end-users sought bypasses. *See Arcadian Corp.,* [April-June 1994 Transfer Binder] Fed. Energy Reg. Comm'n Rep. (CCH) at 61,535-36. FERC reasoned that Atlanta Gas overestimated its losses. Viewing the Atlanta Gas's position "in context," the Commission noted that the Global Settlement between Southern and Atlanta Gas in the wake of the bypass permitted Atlanta Gas to reduce its firm service from Southern by about 15% of its requirements, enough, the Commission found, to "offset" the loss of economic rents from Atlanta Gas's former sales to Arcadian. *Id.* at 61,536.[6] Further, FERC concluded that Atlanta Gas's predictions of future erosions in its customer base, brought about by as yet unknown bypass cases, was "of necessity" speculative and based on an obviously worst-case scenario which the Commission did not believe would occur, *viz.,* that Atlanta Gas would do nothing to compete to retain its current customers. *Id. See also Arcadian Corp.,* [October-December 1992 Transfer Binder] Fed. Energy Reg. Comm'n Rep. (CCH) at 61,680-681 (1992 Order, addressing weaknesses in Atlanta Gas's proffered evidence).

---

[6]Atlanta Gas argues that FERC cannot rely on post-hoc events to evaluate the propriety of a prior policy decision. While this might be true as a general matter, FERC's decision to permit the bypass factored into the public-interest equation Atlanta Gas's ability to take remedial action to mitigate the effects of any immediate losses. *See Arcadian Corp.,* [April-June 1994 Transfer Binder] Fed. Energy Reg. Comm'n Rep. (CCH) at 61,536. (noting that the bypass policy takes into account the fact that "[t]here are competitive responses available to LDCs to avoid the worst case results predicted by Atlanta [Gas]").

11

Atlanta Gas had also challenged the bypass on the ground that it would inhibit the Georgia Public Service Commission's ("PSC") ability to regulate natural gas rates in order to protect the interests of the captive market of residential consumers and that FERC failed to take into consideration these local effects. The Commission discerned that, beyond general statements that bypass results in cost shifts, Atlanta Gas had presented "little evidence to show what the ratemaking policies of the Georgia PSC actually are where bypass is concerned, or how these policies would be affected." *Arcadian Corp.,* [April-June 1994 Transfer Binder] Fed. Energy Reg. Comm'n Rep. (CCH) at 61,539. It also found insufficient evidence of "an official state policy of subsidization of residential customers with economic units secured from business, such that approval of Southern's request would thwart state ratemaking policies." *Id.*[7] Moreover, Atlanta Gas's forecast for residential customers was likewise contingent on the "speculative" assumption that industrial end-users would bypass Atlanta Gas en masse. *Id.* Accordingly, the Commission rejected this objection to the bypass. We cannot say that FERC's rationales for rejecting Atlanta Gas's challenges were arbitrary and capricious.

## 2. *Inadequate Hearing*

Atlanta Gas also contends that it raised questions about certain material facts, the resolution of which mandated that the Commission hold a trial-type evidentiary hearing. The Commission's

---

[7]Even if the Georgia PSC had pursued such a policy, it would not necessarily derail a proposed bypass. The Tenth Circuit approved a bypass under just such conditions, noting that the state utility in question had various options to discourage other industrial end-users from bypassing the LDC. *Cascade,* 955 F.2d at 1424-25 (concluding that though FERC's approval of the bypass "perhaps demonstrates insensitivity to the state's current strategy of subsidizing services to residential consumers, ... there is nothing in this response that would allow us to label the Commission's determination as devoid of a rational basis and therefore arbitrary and capricious").

12

regulations pertaining to settlements allow FERC to decide the merits of contested issues only "if the record contains substantial evidence upon which to base a reasoned decision or the Commission determines that there is no genuine issue of material fact." 18 C.F.R. § 385.602(h)(1)(i). In considering the arguments of Atlanta Gas in its petition for rehearing of the 1992 Order, the Commission found that the record, which included an oral argument as well as the same affidavits that Atlanta Gas submitted for the 1991 and 1992 Orders, was extensive and that there were no material facts in dispute requiring resolution by a trial-type hearing. *Arcadian Corp.,* [April-June 1994 Transfer Binder] Fed. Energy Reg. Comm'n Rep. (CCH) at 61,539. We review FERC's decision not to hold a hearing for an abuse of discretion, *Moreau v. FERC,* 982 F.2d 556, 568 (D.C.Cir.1993), and find no abuse of discretion.

FERC's conclusion that live testimony by either affiant at an evidentiary hearing would not have efficiently furthered the inquiry was within its broad discretion to structure its own proceedings. *See Cascade,* 955 F.2d at 1425 (observing that the Commission has "some flexibility in deciding how it will use its resources to achieve the purposes of the hearing") (citing *Southern Union Gas Co. v. FERC,* 840 F.2d 964, 970-71 (D.C.Cir.1988)); *New Orleans Pub. Serv., Inc. v. FERC,* 659 F.2d 509, 515 (5th Cir.1981) (noting that FERC's decision not to hold evidentiary hearing was "consistent with its authority to tailor administrative procedures to the needs of the particular case") (citing *Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 544, 98 S.Ct. 1197, 1211-12, 55 L.Ed.2d 460 (1978)). Indeed, even if the affidavits had presented material factual disputes, "FERC need not conduct such a hearing if [the disputes] may be adequately resolved on the written record." *Moreau,* 982 F.2d at 568. We cannot say that the Commission abused its discretion in considering Atlanta Gas's arguments based on the ample record before it.

13

### 3. *Procedural Irregularity*

We likewise find unpersuasive Atlanta Gas's claim that the Commission failed to follow applicable NGA § 7 procedures in the course of authorizing Southern's voluntary construction of a sales tap.[8] The essence of this argument is that FERC authorized Southern to construct, operate, and service the connection to Arcadian pursuant to its blanket certificate authority, *Arcadian Corp.,* [April-June 1994 Transfer Binder] Fed. Energy Reg. Comm'n Rep. (CCH) at 61,540,[9] but that Southern failed to file the application required by the governing regulations before such actions may be taken. *See* 18 C.F.R. §§ 157.205 and 157.211.

While it is true that Southern did not technically file an application under the regulation governing the construction of sales taps, the point of that procedure is to provide notice of the proposed action to interested parties. *See* 18 C.F.R. §§ 157.205(a)(1) and 157.211(a)(2). It is absurd to suggest that Atlanta Gas was not placed on notice of the proposed construction or that it lacked adequate opportunity to advance its position;  Atlanta Gas fully participated in the proceedings regarding the settlement, filing multiple comments with the Commission and taking part in oral argument. To accept Atlanta Gas's position on appeal would elevate form over substance, something we shall not do.

### 4. *The 1991 and 1992 Orders:  Mootness and Vacatur*

---

[8]A sales tap refers to "metering and appurtenant facilities necessary to enable the certificate holder to deliver gas to a distribution customer or an end-user."  18 C.F.R. § 157.202(b)(10).

[9]A blanket certificate is a certificate of public convenience and necessity issued to interstate pipelines in order to enable them to take certain specified, limited actions "without further Commission approval."  18 C.F.R. § 157.203 (1997).  Southern was issued one in 1982. *Southern Natural Gas Co.,* [July-September 1982] Fed. Energy Reg. Comm'n Rep. (CCH) ¶ 62,414 (1982) (issuing blanket certificate to Southern under 18 C.F.R. § 157.204, authorizing it to construct certain minor facilities, including sales taps, subject to prior notice procedure).

As we noted at the outset, the 1993 stipulation of settlement between Arcadian and Southern and the Commission's 1994 ratification of that settlement fundamentally altered the landscape of this litigation. The weight of the parties' debate in anticipation of the 1991 and 1992 Orders pertained to FERC's power pursuant to § 5 of the NGA to compel Southern to construct a bypass to alleviate alleged undue discrimination by Southern against Arcadian. In approving the settlement in the 1994 Order, the Commission viewed its action as mooting Arcadian's complaint proceeding as well as Atlanta Gas's challenge to the 1991 and 1992 Orders. *See Arcadian Corp.,* [April-June 1994 Transfer Binder] Fed. Energy Reg. Comm'n Rep. (CCH) at 61,540. Atlanta Gas disputes this conclusion. It argues that the issue of FERC's power under the NGA to order a pipeline to construct a bypass, which power FERC asserted for the first time in the 1991 and 1992 Orders, remains live. In the alternative, it asks this Court to vacate those orders if it finds the issue to be moot.

"Mootness has been described as the doctrine of standing set in a time frame...." *Arizonans for Official English v. Arizona,* 520 U.S. 43, ---- n. 22, 117 S.Ct. 1055, 1069 n. 22, 137 L.Ed.2d 170 (1997) (internal quotation marks omitted). A case becomes moot "when the issues presented are no longer "live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack,* 395 U.S. 486, 496, 89 S.Ct. 1944, 1951, 23 L.Ed.2d 491 (1969). There is no live dispute between the original parties to the suit. Whether Atlanta Gas, an intervenor under FERC's regulations, *see* 18 C.F.R. § 157.10, has a continuing injury sufficient to enliven the suit is less apparent. Atlanta Gas contends that its injury consists of the loss of revenue that it would have received from Arcadian during the period of time following Southern's commencement of direct supply to Arcadian via the bypass (January 1993), which Atlanta Gas claims was done pursuant to unlawful FERC orders, to the date the Commission blessed Southern's settlement and retroactively approved its construction

15

of the bypass (May 1994).[10]  It calculates this loss as approximately $ 4 million.  Assuming *arguendo* that Atlanta Gas's intervenor status itself does not deprive it of the right to maintain an interest in the otherwise defunct lawsuit between Arcadian and Southern, its interest in the action is still insufficient to preclude mootness.  Were we to address the merits of Atlanta Gas's arguments about the 1991 and 1992 Orders, we would still be unable to afford it any relief which could redress its injuries.  *See Purcell v. BankAtlantic Fin. Corp.,* 85 F.3d 1508, 1511 n. 3 (11th Cir.) (" "Central to finding of mootness is a determination by an appellate court that it cannot grant effective judicial relief.' ") (quoting *In re Club Assoc.,* 956 F.2d 1065, 1069 (11th Cir.1992)), *cert. denied sub nom. American Broadcasting Companies, Inc. v. BankAtlantic Financial Corp.,* --- U.S. ----, 117 S.Ct. 178, 136 L.Ed.2d 118 (1996);  *SunAmerica Corp. v. Sun Life Assurance Co. of Canada,* 77 F.3d 1325, 1333 (11th Cir.1996) ("ability of the appellate court to "effectuate a partial remedy' is sufficient to prevent mootness") (quoting *Church of Scientology v. United States,* 506 U.S. 9, 13, 113 S.Ct. 447, 450, 121 L.Ed.2d 313 (1992)), *cert. denied,* --- U.S. ----, 117 S.Ct. 79, 136 L.Ed.2d 37 (1996).  An injunction would do no good because the pipeline has been built, and § 7 of the NGA

---

[10]Under § 16 of the NGA, FERC has the "power to perform any and all acts, and to prescribe, issue, make, amend, and rescind such orders, rules, and regulations as it may find necessary or appropriate to carry out the provisions of this chapter."  15 U.S.C. § 717*o.*  This provision grants FERC "broad authority to do equity consistent with the public interest, and to use means of regulation not spelled out in detail, provided the agency's action conforms with the purposes and policies of Congress and does not convene any terms of the Act." *Northern Natural Gas Co. v. FERC,* 785 F.2d 338, 341 (D.C.Cir.1986) (citations and quotation marks omitted).  Since FERC found the terms of the Southern-Arcadian settlement, including the bypass included therein, to be consistent with the public convenience and necessity required by § 7(e) of the NGA, and because that provision of the statute does not preclude the retroactive approval of actions undertaken by a pipeline pursuant to a settlement, FERC was empowered to approve a bypass which had already been constructed.

16

does not provide an action for damages. Thus, we have no difficulty in concluding that the 1991 and 1992 Orders are moot.

In light of the mootness of Atlanta Gas's challenges against the 1991 and 1992 Orders, the question we must resolve is whether vacatur of those orders is proper. Atlanta Gas contends that vacatur is appropriate under *United States v. Munsingwear,* 340 U.S. 36, 71 S.Ct. 104, 95 L.Ed. 36 (1950), and *A.L. Mechling Barge Lines v. United States,* 368 U.S. 324, 82 S.Ct. 337, 7 L.Ed.2d 317 (1961). In *Munsingwear,* the Supreme Court stated that its "established practice" was to vacate the opinion of a district court which has been mooted by a change in circumstances while the case is pending appeal. *Id.* at 39, 71 S.Ct. at 106. That practice "clears the path for future relitigation of the issues between the parties and eliminates a judgment, review of which was prevented through happenstance. When that procedure is followed, the rights of all parties are preserved[.]" *Id.* at 40, 71 S.Ct. at 107. In *Mechling,* the Supreme Court held that "the principle enunciated in *Munsingwear* [is] at least equally applicable to unreviewed administrative orders." 368 U.S. at 329, 82 S.Ct. at 341.

FERC does not address the question of vacatur in its brief. We conclude that under *Mechling,* the 1991 and 1992 Orders should be vacated. In *Mechling,* several railroads filed tariffs with the Interstate Commerce Commission ("ICC"). Over the objections of several barge lines, the ICC granted temporary approval of the tariffs, and the barge lines filed a declaratory judgment action in district court. While the case was pending, the railroads withdrew the portion of the tariffs that the barge lines were contesting and filed a motion to dismiss the case on the ground that it was moot. The district court granted the motion, and the barge lines appealed directly to the Supreme Court, which applied "the principle enunciated in *Munsingwear* " and held that "[t]he District Court

17

should have vacated the order which it declined to review." *Mechling,* 368 U.S. at 329, 82 S.Ct. at 341. *See, e.g., American Family Life Assurance Co. of Columbus v. FCC,* 129 F.3d 625, 630 (D.C.Cir.1997) (noting that "[s]ince *Mechling* we have, as a matter of course, vacated agency orders in cases that have become moot by the time of judicial review").

This result serves the policies animating *Mechling* and *Munsingwear. See Westmoreland v. National Transp. Safety Bd.,* 833 F.2d 1461, 1463 (11th Cir.1987) (emphasizing that courts should not apply the vacatur rule "automatically," but instead should consider the policies underlying *Munsingwear* and *Mechling* before deciding if vacatur is appropriate). Those cases are premised on the equitable principle that "[a] party who seeks review of the merits of an adverse ruling, but is frustrated by the vagaries of circumstance, ought not in fairness be forced to acquiesce in the judgment." *U.S. Bancorp Mortgage Co. v. Bonner Mall Partnership,* 513 U.S. 18, 25, 115 S.Ct. 386, 391, 130 L.Ed.2d 233 (1994). Atlanta Gas did nothing to moot the 1991 and 1992 Orders. Those rulings were mooted by Southern's decision to settle the complaint proceeding brought by Arcadian against it.[11] By vacating the 1991 and 1992 Orders we express no view as to the merits

---

[11]FERC asserted in the 1996 Order that Atlanta Gas's involvement in the Global Settlement "caused the mootness" in this case, and that, therefore, vacatur is inappropriate. *See Arcadian Corp.,* [October-December 1996 Transfer Binder] Fed. Energy Reg. Comm'n Rep. (CCH) at 61, 859. FERC relied on the Supreme Court's holding in *Bancorp, supra,* which reaffirmed "*Munsingwear* 's dictum that mootness by happenstance provides sufficient reason to vacate," *Bancorp,* 513 U.S. at 25 n. 3, 115 S.Ct. at 392 n. 3, but held that a party who moots a dispute through settlement and thereby forfeits its legal right of appeal or certiorari "surrender[s][its] claim to the equitable remedy of vacatur." *Id.* at 25, 115 S.Ct. at 392. In that case, the parties to the action mooted the case through settlement, and the losing party in the court of appeals (Bancorp) sought to vacate the court's opinion. The Supreme Court therefore denied Bancorp's plea to vacate the adverse opinion of the court of appeals. *Id.* at 29, 115 S.Ct. at 393-94.

However, *Bancorp* does not control this case because Atlanta Gas was not a party to the settlement which mooted the action. FERC acknowledged as much when it found, in the 1994 Order, that the Southern-Arcadian settlement was the relevant source of

18

of FERC's asserted authority under § 5 of the NGA to compel a pipeline to construct a bypass to provide direct service to an industrial end-user. FERC is not harmed by our decision to vacate, for our decision does not foreclose FERC from asserting its view of its powers in an appropriate future proceeding. *See Mechling,* 368 U.S. at 330, 82 S.Ct. at 341. In accord with *Mechling* and *Munsingwear,* we vacate the 1991 and 1992 Orders.

D. *Dalton's Rate Challenge*

Dalton contends that the *pro forma* bypass tariff provisions approved in the 1994 and 1996 Orders allow Southern to compete unfairly with Dalton in the provision of gas services to industrial end-users. Specifically, Dalton focuses on a provision of the approved tariff which requires Southern to accede to "economically feasible" bypass requests by end-users; defines economic feasibility as an arrangement that either produces a revenue gain or is "revenue neutral"; and deems a bypass revenue neutral if the shipper obtaining the direct connection (presumably the end-user) pays for the construction of the direct connection. Among other things, Dalton contends that this provision would make it impossible for it and other LDCs to compete with Southern for the requirements of industrial end-users. The Commission found this core contention unpersuasive. First, the Commission reiterated that it anticipated strong competition with pipeline services from LDCs. *Arcadian Corp.,* [October-December 1996 Transfer Binder] Fed. Energy Reg. Comm'n Rep. (CCH) at 61,860. Moreover, it announced its intent to construe Southern's tariff provisions on a case-by-case basis to ensure such competition is fair. *Id.* Finally, FERC observed that the Global

mootness. *See Arcadian Corp.,* [April-June 1994 Transfer Binder] Fed. Energy Reg. Comm'n Rep. (CCH) at 61,539 (stating that the question of the Commission's authority to compel the bypass had been rendered "demonstrably moot *since Southern no longer opposes Arcadian's request for service, but instead is actively seeking authority to provide it.*") (emphasis added).

19

Settlement provisions regarding absorption of discounts, the PSC-out clause, and the load loss provision, taken together, reduced the significance of Dalton's concerns. *Id.* Accordingly, the Commission rejected Dalton's argument.

Dalton appeals this decision. However, its appeal is not ripe. Ripeness concerns "the timing of the suit." *Wilderness Society v. Alcock,* 83 F.3d 386, 390 (11th Cir.1996). "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States,* --- U.S. ----, ----, 118 S.Ct. 1257, 1259, --- L.Ed.2d ---- (1998) (internal quotation marks omitted). The doctrine of ripeness " "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies' as well as "protect[s] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.' " *Wilderness Society,* 83 F.3d at 390 (quoting *Abbott Laboratories v. Gardner,* 387 U.S. 136, 148-49, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967)). Although the NGA does not impose a ripeness requirement on judicial review of its orders, we have long held that FERC orders must be ripe for judicial review. *Pennzoil Co. v. FERC,* 645 F.2d 394, 398 (5th Cir.1981).

To determine whether a claim is ripe for review, a court must "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Laboratories,* 387 U.S. at 149, 87 S.Ct. at 1515. This evaluation is informed by consideration of four factors: (1) whether the issues presented are "purely legal"; (2) whether the challenged agency action constitutes "final agency action"; (3) whether the administrative action has a "direct and immediate" impact on the petitioner; and (4) whether judicial resolution of the

claim will aid, rather than impede, effective administration by the agency. *Id.* at 149-54, 87 S.Ct. at 1515-19; *Pennzoil,* 645 F.2d at 398.

These considerations counsel against deciding the merits of Dalton's challenge to the tariff provisions at this juncture. First, Dalton's challenge does not present a purely legal question. Whether the economic feasibility provision of the Southern-Arcadian settlement unduly discriminates against Dalton depends entirely on the specific terms involved in a future bypass and Dalton's relative market position at that time. Second, at the time of a proposed bypass affecting Dalton, Southern will have to follow the notice procedures of 18 C.F.R. § 157.205, Dalton will have an opportunity to protest, and the Commission will make a determination of whether the bypass is in the public convenience and necessity. Until this "second-stage" administrative decision is made, no relevant final agency action has been taken. *Wilderness Society,* 83 F.3d at 390. Third, because no end-user customer of Dalton's has sought to bypass it yet, the 1994 and 1996 Orders have no "direct and immediate" impact on Dalton.[12] Finally, judicial evaluation of the merits of Dalton's challenge without sufficient factual development of a particular bypass case is improper and risks interference with FERC's bypass policy, which assumes that LDCs will take steps to compete with pipelines for the business natural gas consumers.

---

[12]Dalton argues that the tariff provisions nonetheless injure it presently because (1) they undermine Dalton's "competitive position" with its customers even before the customers seek direct service from Southern, (2) Dalton would bear the burden of proof in a future challenge to a proposed bypass agreement, and (3) any Section 5 hearing is certain to be protracted and costly. However, for the impact of a FERC order to qualify as immediate, it "must have "some substantial effect on the parties which cannot be altered by subsequent administrative action.' " *Pennzoil,* 645 F.2d at 399 (quoting *Atlanta Gas Light Co. v. Federal Power Comm'n,* 476 F.2d 142, 147 (5th Cir.1973)). FERC's opportunity to reject a particular future bypass on its merits forecloses a showing of immediacy by Dalton.

Accordingly, we dismiss Dalton's petition as unripe and affirm the Commission's approval of Southern's *pro forma* tariff bypass provisions.

CONCLUSION

In light of the foregoing, we AFFIRM the Commission's 1994 and 1996 Orders and direct the Commission to VACATE the 1991 and 1992 Orders.

AFFIRMED in part and REVERSED in part.