[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 20, 2002
THOMAS K. KAHN
CLERK

No. 01-10216

FERC No. CP99-604-000

BOARD OF WATER, LIGHT and SINKING FUND
COMMISSIONERS OF THE CITY OF DALTON,
GEORGIA,

Petitioner-Appellant,

versus

FEDERAL ENERGY REGULATORY COMMISSION,

Respondent-Appellee.

_____

Petition for Review of Orders of the
Federal Energy Regulatory Commission

_____

**(June 20, 20002)**

Before ANDERSON and BLACK, Circuit Judges, and NANGLE[*], District Judge.

_____

[*]Honorable John F. Nangle, U.S. District Judge for the Eastern District of
Missouri, sitting by designation.

ANDERSON, Circuit Judge:

Petitioner Board of Water, Light & Sinking Fund Commissioners of the City of Dalton, Georgia ("Dalton") challenges two orders by the Federal Energy Regulatory Commission ("FERC" or the "Commission") permitting the construction of a direct delivery connection between Southern Natural Gas Company's ("Southern") natural gas pipeline and one of Dalton's current customers, the Beaulieu Plant ("Beaulieu"). The proposed connection will allow Beaulieu to bypass Dalton. Dalton contends that FERC's orders are unlawful for several reasons, including that they violate Southern's tariff and that they were impermissible under various sections of the Natural Gas Act ("NGA"). Dalton also challenges whether the Commission had jurisdiction under the NGA to issue the orders permitting the direct pipeline connection, arguing that by approving the bypass connection, the Commission intruded into the state's regulatory province over local distribution of natural gas. We conclude that the Commission had jurisdiction to issue its orders, and that it did not act arbitrarily or capriciously in deciding that the requested bypass connection should be permitted. Furthermore, we conclude that the Commission did not abuse its discretion by denying the request for an evidentiary hearing.

2

## I. FACTUAL AND PROCEDURAL BACKGROUND

A.  Southern's Policy Concerning Direct Delivery Connections

The issues involved in this case derive in part from a previous action in which an end-user of natural gas, Arcadian Corp. ("Arcadian"), sought to require Southern to grant it a direct delivery connection[1] to Southern's pipeline.  On May 12, 1994, the Commission approved a settlement in Arcadian's case,  pursuant to which Southern was required to construct a bypass connection for Arcadian.  Furthermore, the settlement required Southern to file proposed tariff[2] provisions governing future requests by end-users of natural gas seeking direct delivery pipeline connections.  See Arcadian Corp. v. Southern Natural Gas Co., 67 FERC ¶61,176 (1994).  The direct delivery provision eventually approved by FERC became § 36 of Southern's tariff.  Section 36, in relevant part, states:

DIRECT DELIVERY CONNECTIONS

---

[1]Direct delivery connections are also commonly referred to as "bypass connections" because they permit an end-user to bypass a local distribution company by utilizing the direct connection to the pipeline.  We will use these terms interchangeably in this opinion.

[2]"A tariff is the 'contract which governs a pipeline's service to its customers.' . . . It contains a listing of the pipeline's rate schedules and the terms of its service agreements with customers."  Atlanta Gas Lights Co. v. FERC, 140 F.3d 1392, 1395 n.1 (11th Cir. 1998) (citations and quotations omitted).

(a) As used herein, the term direct delivery connection shall refer to interconnection, measurement, and appurtenant facilities necessary to deliver gas directly to an end-user.

(b) A SHIPPER may request a new direct delivery connection by submitting to the attention of [Southern's] Transportation Services Department, . . . a written request to [Southern] in the format set out in Appendix A to these General Terms and Conditions.  If SHIPPER is currently receiving natural gas services from the local distributor servicing the area, or if the direct delivery connection is in the authorized service area of a local distribution company, SHIPPER shall provide a copy of its request for a direct delivery connection to such local distribution company.  SHIPPER shall notify [Southern] of the date SHIPPER has complied with this notice requirement, and [Southern] shall not make the filing required by Section 157.211(a)(2) of the Commission's Regulations until thirty (30) days after the date SHIPPER notified such local distribution company of its request for a direct delivery connection.

(c) [Southern] will add a new direct delivery connection if such direct delivery connection is operationally and economically feasible.

(d) A direct delivery connection is operationally feasible if, with such connection facilities, [Southern] has the existing pipeline capacity to perform the requested service through the proposed direct delivery connection and such service will not impair [Southern's] ability to provide service to its existing firm customers.

(e)　　(1) A direct delivery connection is economically feasible if the proposed transportation service to be provided through the direct deliver connection will produce a net revenue gain ("revenue positive"), or is revenue neutral to [Southern].

　　　　(2) To the extent that the new direct delivery connection serves an end-user that has historically been served by a firm customer of [Southern], the proposed transportation service to be provided through the new direct delivery connection will be deemed revenue positive or revenue neutral if the costs set out

in Section 26(f)(1), (3), and (4), as applicable, are paid or reimbursed in full by the SHIPPER obtaining the direct delivery connection. . . .

(f) The costs referenced in Sections 36(e) (2) and (3), as applicable are:

(1) All costs, including overheads and taxes, associated with construction of the required direct delivery connection facilities and with any modifications to existing facilities required to maintain service to existing firm customers. . . .

(g) After the SHIPPER requesting the direct delivery connection executes an interconnection agreement agreeing to pay or reimburse [Southern] in full for the costs set out in Section 36(f) (1), (2), (3), and (4), as applicable, and [Southern] has received all necessary regulatory authorizations to construct, install, and operate the direct delivery connection facilities, [Southern] shall commence construction of the new direct delivery connection in accordance with the terms of such agreement and regulatory authorizations.

Southern's Natural Gas Tariff, Seventh Revised, § 36. Therefore, subject to regulatory authorization by FERC, section 36 requires Southern to provide a direct delivery connection to an end-user when such a connection is requested by a shipper, if providing the connection will either result in a revenue gain, or will be revenue neutral, to the pipeline. Furthermore, section 36 indicates that a connection will be considered "revenue neutral" if the shipper agrees to pay or reimburse for all of th costs of the connection to Southern.

B. The Beaulieu Plant and Dalton

5

Beaulieu is a carpet manufacturer that became a natural gas customer of Dalton in 1971.[3]  Initially, Dalton provided the Beaulieu Plant with "firm" gas service, meaning that Beaulieu was guaranteed a certain amount of gas and in exchange had to pay reservation or "demand" charges to Dalton, regardless of whether it actually used the gas.   But in 1987 Beaulieu switched to an "interruptible" arrangement,[4] under which it purchases gas from third-party marketers, while retaining the option to purchase gas directly from Dalton when its supply from third-party marketers is inadequate.

In 1997, Beaulieu began purchasing its natural gas from Interconn Resources, Inc. ("Interconn"), a third-party marketer.   Under its current arrangement, Interconn purchases natural gas from out-of-state third parties, and then transports the gas along Southern's pipeline.  Interconn retains title to the gas until it reaches Dalton's city gate station, at which point title is transferred to Beaulieu.  Dalton then delivers the gas to Beaulieu's plant and charges a transportation fee to Beaulieu.

---

[3]When Dalton first began providing gas to the Beaulieu Plant, it was owned and operated by Coronet Carpets.  Beaulieu did not acquire the plant until 1989 or 1990.

[4]"Interruptible" service refers to service which may be interrupted by the seller, in this case Dalton, and for which the end-user does not have to pay monthly demand charges.

The gas supplied to Beaulieu in this manner accounts for approximately 5% of the total volume of Dalton's throughput. According to Dalton, it has always been able to meet Beaulieu's natural gas needs.

## C. Beaulieu's Request for a Direct Delivery Connection

On August 3, 1998, Interconn advised Dalton that it had been retained by Beaulieu to act as its agent in obtaining a direct delivery connection to Southern's pipeline. Interconn informed Dalton that it had submitted a request form to Southern concerning the necessary facilities. Over a year later, on August 18, 1999, Southern filed a notice pursuant to 18 C.F.R. §§ 157.205 and 157.211 with FERC, proposing to establish the new delivery point for Beaulieu.

Under the proposal filed with the Commission, Interconn would purchase natural gas for Beaulieu out of state and then ship the gas along Southern's pipeline to the new facility, at which point title would pass to Beaulieu.[5] Southern would operate the meter station and related facilities, but Beaulieu would

---

[5]Therefore, there is only one difference between the current and proposed arrangements. Currently, Interconn passes title to the gas to Beaulieu at Dalton's city gate station, and Dalton gets a fee for transporting the gas from that point to the plant. Under the proposed arrangement, title would pass to Beaulieu at the new direct delivery station, and Dalton would neither transport, nor receive a fee for, the natural gas going to the Beaulieu Plant.

reimburse Southern for its expenses in doing so. In addition, Interconn, acting as Beaulieu's agent, would construct and operate a four-mile long pipeline connecting Beaulieu's plant to the new connection facility. Therefore, Beaulieu, by itself or through its agent, would construct, own, operate, and pay for the new facilities.

After Southern filed its notice concerning the direct connection facility for Beaulieu, Dalton filed a protest with the Commission complaining that Southern's application violated FERC regulations concerning notice, that the proposed bypass connection did not comply with the applicable requirements from § 36 of Southern's tariff, that the proposed connection was not for the "public convenience and necessity" as required by § 7 of the NGA, and that the proposed activities would constitute local distribution over which the Commission had no jurisdiction.

Treating Southern's proposal as an application for specific NGA § 7(c) authorization,[6] FERC issued an order on April 3, 2000 denying Dalton's protest and request for an evidentiary hearing, and granting Southern authorization to construct the new connection. In particular, the Commission found that the

---

[6]Pursuant to FERC regulations, when a pipeline makes a request for authorization pursuant to its blanket certificate of public convenience and necessity (as Southern did in this case), authorization is automatically granted if no one files a protest withing 45 days. Authorization is also automatic if all protests are withdrawn within 30 days after the 45-day notice period. If, however, all protests are not resolved, then the request is treated as a case-specific authorization request under NGA § 7(c).

8

proposal was consistent with § 36 of Southern's tariff, that Dalton had not shown that it or its customers would be unfairly or unreasonably harmed by the bypass, and that the proposal was justified by FERC's policy of encouraging competition between pipelines and local distribution companies ("LDC").

Dalton moved the Commission for a rehearing based on the same objections previously asserted, and complained that FERC's initial order was arbitrary and capricious, unjust and unreasonable, and unsupported by the record. Subsequently, the Commission issued additional data requests to Southern and Interconn, but, on November 13, 2000, it denied the request for rehearing. The Commission again found that the proposal, and Southern's actions, were consistent with the intent behind § 36 of its tariff, and with FERC's pro-competitive bypass policy. The Commission rejected Dalton's arguments.

Dalton filed a timely petition for review of both the April 3 and November 13 orders. Southern, Interconn and Beaulieu have not intervened or participated in the proceedings before this Court. The authorized delivery point on Southern's pipeline has not yet been installed.

## II. DISCUSSION

A.   FERC's Jurisdiction Over the Direct Delivery Pipeline Connection Sought

by Beaulieu

Although Dalton challenges the Commission's actions with respect to approving the bypass connection on numerous grounds, only one issue presented by Dalton requires extended discussion. That is whether the Commission had jurisdiction, pursuant to the NGA, to approve the direct delivery connection facilities, or whether it intruded into areas reserved for state regulation by doing so. Dalton notes that FERC's jurisdiction is limited to the interstate transport of natural gas and to sales of natural gas to distributors for resale, but does not include regulation of direct sales to retail consumers. Because title to the natural gas purchased by Beaulieu is to pass from Interconn to Beaulieu at the site of the proposed new facility, and therefore the sale to Beaulieu arguably occurs at that point, Dalton contends that the direct delivery connection constitutes a form of local distribution within the jurisdiction of state regulators, rather than FERC. Consistent with the other circuit courts that have considered this issue, we conclude that the Commission was acting well within its jurisdictional mandate in approving the direct delivery connection for Beaulieu.

"We review the Commission's determination that construction of the facility is jurisdictional to ascertain whether the decision has an adequate basis in law." Cascade Natural Gas Corp. v. FERC, 955 F.2d 1412, 1415 (10th Cir. 1992)

10

(citations, quotations and brackets omitted).  As Dalton correctly points out, FERC's jurisdiction under the NGA is limited, and, in drafting that Act, Congress intended to leave the states with authority to regulate certain aspects of the natural gas industry.  The jurisdictional provision in the NGA related to FERC's authority to regulate natural gas states:

> The provisions of this chapter shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale, but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas.

15 U.S.C. § 717(b).  Therefore, Congress began by granting FERC broad authority over the interstate transport and sale of natural gas, but then carved out an exclusion leaving states exclusive regulatory authority over intrastate transportation and sales, and in particular over the "local distribution" of natural gas to consumers.

Accordingly, in Panhandle Eastern Pipe Line Co. v. Public Serv. Comm. of Ind., the Supreme Court stated:

> Three things and three only Congress drew within its own regulatory power, delegated by the Act to its agent, the Federal Power Commission [FERC's predecessor agency]. These were: (1) the transportation of natural gas in interstate commerce; (2) its sale in

11

interstate commerce for resale; and (3) natural gas companies engaged in such transportation or sale.

332 U.S. 507, 516, 68 S. Ct. 190, 195 (1947).  The Court continued by noting that "[t]he Act was drawn with meticulous regard for the continued exercise of state power, not to handicap or dilute it in any way."  Id. at 517-18, 68 S. Ct. at 195-96.  The NGA left the states with authority to regulate "in-state retail sales of natural gas" and "local distribution."  General Motors Corp. v. Tracy, 519 U.S. 278, 292 & 294, 117 S. Ct. 811, 821-22 (1997).  The resulting regulatory system under the NGA is, therefore, one of "complementary federal regulation of the interstate market and congressionally approved state regulation of the intrastate gas trade."  Id. at 293, 117 S. Ct. at 821.

In 1978, the relationship between federal and state regulation of natural gas began to undergo some changes, however, as "Congress took a first stop toward increasing competition in the natural gas market by enacting the Natural Gas Policy Act."  Id. at 283, 117 S. Ct. at 816.  Prior to this shift in policy:

> The . . . market structure virtually precluded competition between LDC's and other potential suppliers of natural gas for direct sales to consumers, including large industrial consumers. The simplicity of this dual system of federal and state regulation began to erode in 1978, however, when Congress first encouraged interstate pipelines to provide transportation services to end users wishing to ship gas, and thereby moved toward providing a real choice to those consumers who were able to buy gas on the open market and were willing to take

12

it free of state-created obligations to the buyer. The upshot of congressional and regulatory developments over the next 15 years was increasing opportunity for a consumer in that class to choose between gas sold by marketers and gas bundled with rights and benefits mandated by state regulators as sold by LDC's. But amidst such changes, two things remained the same throughout the period involved in this case. Congress did nothing to limit the States' traditional autonomy to authorize and regulate local gas franchises, and the local franchised utilities (though no longer guaranteed monopolies as to all natural gas demand) continued to provide bundled gas to the vast majority of consumers who had neither the capacity to buy on the interstate market nor the resilience to forgo the reliability and protection that state regulation provided.

Id. at 293-94, 117 S. Ct. at 821-22 (footnote omitted). Therefore, the current regulatory framework still reserves for states the right to regulate local distribution, while permitting pipelines, pursuant to FERC's jurisdiction, to engage in the interstate transport of natural gas purchased by end-users from other sources in competition with LDCs.

It is against this backdrop that we are called on to decide whether the Commission acted within its jurisdiction in approving the direct delivery connection sought by Beaulieu. Several other courts, and the Commission, have addressed this question and have consistently found that the Commission does not unlawfully impinge on states' regulatory authority by authorizing direct delivery facilities permitting LDCs to be bypassed. See Cascade Natural Gas Corp. v FERC, 955 F.2d 1412 (10th Cir. 1992) (holding that FERC had jurisdiction to

13

approve bypass connection because arrangement involved interstate sale and transport) ;Michigan Natural Gas Co. v. Panhandle Eastern Pipe Line Co., 887 F.2d 1295, 1299-1300 (6th Cir. 1989)  Michigan Consolidates Gas Co. v. FERC, 883 F.2d 117, 121 (D.C. Cir. 1989); cf. Midwestern Gas Transmission Co. v. McCarty, 270 F.3d 536, 538 (7th Cir. 2001) (noting in dicta that bypass facilities appeared to be within FERC's jurisdiction given interstate transportation).

The Tenth Circuit in Cascade engaged in an extensive analysis of whether FERC had jurisdiction to authorize bypass connections to end-users. See Id. 955 F.2d at 1414-21.  As discussed above, the NGA reserves for states the authority to regulate local distribution of natural gas.  The Cascade Court stated that "local distribution," for purposes of the NGA, is comprised of "local retail sales to consumers, whether these sales were made by the local distributing companies or directly by the interstate pipelines."  Id. at 1418 (emphasis deleted).  The Court noted that a review of the legislative history of the jurisdictional provisions of the NGA confirmed its view that "Congress cleanly adopted the bright line between sales for resale and direct retail sales drawn by the earlier Commerce Clause cases."  Id. at 1418-19.

Next, the Cascade Court considered the nature of the bypass transactions involved in that case to determine whether FERC was intruding into local

14

distribution. The Court noted that the "Commission [had] approved construction to enable [the pipeline] to transport gas interstate for hire, pursuant to out-of-state third-party sales." Id. at 1419. Noting that no sales were taking place by the pipeline at the location of the bypass connection, the Court concluded that, "[q]uite simply, the bypass transactions do not entail the realm of local retail sales that Congress intended to reserve to the states. . . . [because] there is no evidence that Congress intended to preserve state regulation over the interstate transportation for hire pursuant to an out-of-state sale." Id. The Court also rejected the notion that FERC lacked jurisdiction because the "the bypass involves the 'functional equivalent' of local distribution." Id. at 1420.

Both the D.C. and the Sixth Circuits[7] have reached the same conclusion – i.e. on similar facts, holding that the Commission operated within its jurisdiction over the interstate transportation of gas when it approved bypass arrangements. In Michigan Consolidated Gas Co. v. FERC, the D.C. Circuit considered whether

_____

[7]In a recent decision, the Seventh Circuit also indicated in dicta that it agreed with these Courts that "the transportation of natural gas bought and produced out of state to [in-state] residents via [a] pipeline is interstate transportation" subject to FERC's jurisdiction. Midwestern Gas Transmission Co. v. McCarty, 270 F.3d 536, 538 (7th Cir. 2001) (reversing district court's Younger abstention in case brought by FERC seeking to enjoin state regulators from acting in manner that could have interfered with the Commission's approval of direct delivery connection).

15

FERC had authority to approve a bypass arrangement even if the direct connection would have local effects on LDCs. 883 F.2d 117, 121-22 (D.C. Cir. 1989). The Court stated that it had "no difficulty in holding that FERC [had] jurisdiction over the [bypass] arrangement . . . . [because] [t]he arrangement in dispute involve[d] merely interstate transportation of natural gas, a subject matter clearly within the Commission's jurisdiction." Id. at 121. The Court concluded that "[t]he present arrangement is the subject of federal regulation pursuant to the NGA because the arrangement involves the transportation of natural gas in interstate commerce, not a local sale. . . [and the pipeline's] role under the arrangement is simply to transport [the end-user's] gas from one state to another across several intervening states." Id. The Court further acknowledged that the sale of natural gas to the end-user was retail rather than wholesale, but found that fact to be of no consequence to the jurisdictional issue before it because the bypass arrangement approved by FERC involved only the interstate transport of the gas purchased by the end-user, rather than any approval of the retail sale. Id. at 121-22.

The Sixth Circuit later adopted the D.C. Circuit's approach, and found that FERC acted within its jurisdiction in approving a bypass connection for an end-user. See Michigan Natural Gas Co. v. Panhandle Eastern Pipe Line Co., 887 F.2d 1295, 1299-1300 (6th Cir. 1989). The Court concluded that the arrangement

involved interstate transport by the pipeline, and that if Congress intended to exclude the "functional equivalent" of local distribution from FERC jurisdiction, it could have done so explicitly. Id. at 1300.

In light of this precedent, we now consider whether the Commission had jurisdiction to approve the bypass for Beaulieu. We agree with the approach taken by the Sixth, Tenth and D.C. Circuits, and would follow those Courts without much discussion, except that this case has one factual distinction. In each of those cases, the end-user purchased the natural gas out of the state, and sought a direct connection from the pipeline, with the natural gas being transported interstate over the pipeline to the end-user at the new bypass tap facility. Consequently, it was clear that none of those cases involved a local sale. In this case, however, it is Interconn, rather than the end-user Beaulieu, who will purchase the natural gas out of state and have it transported by the pipeline to the direct delivery connection facility. The title to the natural gas will pass to Beaulieu at the new facility, thereby arguably effecting a local sale.

Despite this factual distinction, we readily conclude that the Commission had jurisdiction to approve the bypass arrangement at issue in this case. As with the previous bypass cases, the only part of the arrangement approved by the Commission is clearly related to the interstate transportation of natural gas.

17

Consequently, the approved facilities fall squarely within the Commission's jurisdiction. While the new facilities arguably facilitate a local retail sale from Interconn to Beaulieu, and that sale may or may not be subject to state regulation, the Commission clearly did not pass on that sale.[8] Like the D.C. Circuit in Michigan Consolidated, we do not believe that the existence of local effects which may be subject to state regulation deprives the Commission of authority to regulate the interstate transport of natural gas – an issue squarely within FERC's jurisdictional mandate. Michigan Consolidated, 883 F.2d at 121-22.

Further support for our determination comes from the Supreme Court's recent decision in New York v. FERC, ___ U.S. ___, 122 S. Ct. 1012 (2002), addressing FERC's jurisdiction over the transmission and sale of electricity. Although the jurisdictional provisions related to electricity are not the same as the ones governing natural gas, they are similar in that they provide FERC with

_____

[8]We express no opinion on whether or how the State of Georgia may regulate Interconn's sale to Beaulieu, if in fact that sale takes place in Georgia. We do note, however, that there appears to be no more of a local sale under the proposed arrangement than under the current arrangement. In both cases, title passes from Interconn to Beaulieu in Georgia. The only difference is that title currently passes at Dalton's city gates, and Dalton is able to collect a fee for delivering the gas the rest of the way to the Beaulieu Plant, whereas under the proposed arrangement, the natural gas would be diverted before it ever reaches Dalton, thereby depriving Dalton of the opportunity to receive any fee. We have no occasion to address whether this distinction matters, in that the Commission did not seek to regulate any local sale, regardless of where it takes place.

18

regulatory authority over "the transmission of electric energy in interstate commerce" and "the sale of electric energy at wholesale in interstate commerce," while leaving to states the regulation of local distribution and local retail sales. Id. at 1017. Furthermore, similar to the natural gas industry, the electric energy industry has undergone significant changes since the time that Congress undertook to regulate it. The current system permits the "'functional unbundling' of wholesale generation and transmission services," thereby permitting consumers to seek power generation, transmission, and ancillary services from multiple sources, rather than just from one utility company. Id. at 1019-20. Therefore, a consumer now may purchase electricity from an out-of-state wholesaler, and contract with a another utility to have the electricity transmitted to its location, while bypassing a local distributor.

At issue in New York was whether FERC properly asserted jurisdiction over the interstate transmission of electricity to such retail consumers. In answering this question, the Supreme Court concluded that the Commission's exercise of jurisdiction over the interstate transmission to an end-user of electricity was proper in light of the "clear and specific grant of jurisdiction to FERC over interstate transmissions," even though it facilitated a retail sale that would otherwise be outside of FERC's jurisdiction. Id. at 1025 (quotations omitted). In reaching this

19

conclusion, the Supreme Court stated:

> This statutory text thus unambiguously authorizes FERC to assert jurisdiction over two separate activities – transmitting and selling. It is true that FERC's jurisdiction over the sale of power has been specifically confined to the wholesale market. However, FERC's jurisdiction over electricity transmissions contains no such limitation. Because the FPA authorizes FERC's jurisdiction over interstate transmissions, without regard to whether the transmissions are sold to a reseller or directly to a consumer, FERC's exercise of this power is valid.

Id. at 1024.

Furthermore, the Court stated that the fact that retail sales are generally subject to state regulation does not deprive FERC of jurisdiction over interstate transmissions. Id. at 1026. The Court found significant the fact that the Commission had expressly declined to consider the retail sale portion of the arrangements, instead limiting its jurisdictional reach to issues related to the interstate transmission of electricity pursuant to an unbundled, retail sale. Id. at 1026.

We find the New York case instructive as to the Supreme Court's method of determining the proper boundaries of FERC's regulatory authority. This decision clearly reveals the significance of unambiguous statutory language. See also CBS, Inc. v. Primetime 24 Joint Venture, 245 F.3d 1217, 1222 (11th Cir. 2001) (noting that plain meaning of statute controls its interpretation).

20

As was true in <u>New York</u>, the Commission in this case acted within the letter of its statutory jurisdictional grant when it approved the facilities at issue because those facilities related to the interstate transport of natural gas. Also similar to <u>New York</u>, it is of no consequence that the Commission's exercise of its jurisdiction facilitates a retail sale, because the Commission did not attempt to regulate any such sale. Simply put, states' authority to regulate local retail sales does not act as a limit on the Commission's jurisdiction over interstate transportation, even if that transportation might facilitate retail sales.

Following the approach of the Sixth Circuit, the Tenth Circuit, the D.C. Circuit, and the Supreme Court, we conclude that the Commission had jurisdiction, pursuant to its statutory grant of jurisdiction over the interstate transport of natural gas, to approve the direct delivery connection facilities at issue in this case.

B. <u>Dalton's Requests for Discovery</u>

Having found that the Commission had jurisdiction under the NGA to consider the direct delivery connection sought by Beaulieu, we now turn to Dalton's arguments concerning the procedures employed by the Commission in connection with its consideration of the request for the new facilities. Dalton maintains that the Commission erred by denying Dalton's request that it conduct an

21

evidentiary hearing and require Southern to provide discovery concerning the proposed bypass arrangement. It contends that such procedures were necessary in order for the Commission to determine whether the arrangement might have anti-competitive or other negative effects. Dalton also suggests that such proceedings were necessary to determine whether there was underlying anti-competitive agreement between Southern, Beaulieu, Interconn, or any other parties. Dalton maintains that the lack of an evidentiary hearing, or related discovery, rendered the proceedings unfair.[9]

In Atlanta Gas Light, we rejected a similar contention by a party who complained about the Commission's decision to proceed without an evidentiary hearing, stating:

> The Commission's regulations pertaining to settlements allow FERC to decide the merits of contested issues only "if the record contains substantial evidence upon which to base a reasoned decision or the Commission determines that there is no genuine issue of material fact." 18 C.F.R. § 385.602(h)(1)(i). In considering the arguments of

---

[9]With respect to the request for discovery, it is not at all clear to us that the Commission's regulations provided Dalton with any entitlement to discovery in the first place in this case. As Southern pointed out to Dalton in its response to Dalton's data requests, the Commission's regulations providing for discovery only apply to "proceedings set for hearing under Subpart E of this part, and to such other proceedings as the Commission may order." 28 C.F.R § 385.401. Because the Commission did not set the proceedings for a hearing, the discovery provisions never came into play. Therefore, the issue of the denial of discovery is subsumed into our review of the denial of an evidentiary hearing.

Atlanta Gas in its petition for rehearing of the 1992 Order, the Commission found that the record, which included an oral argument as well as the same affidavits that Atlanta Gas submitted for the 1991 and 1992 Orders, was extensive and that there were no material facts in dispute requiring resolution by a trial-type hearing. We review FERC's decision not to hold a hearing for an abuse of discretion, and find no abuse of discretion.

FERC's conclusion that live testimony by either affiant at an evidentiary hearing would not have efficiently furthered the inquiry was within its broad discretion to structure its own proceedings. Indeed, even if the affidavits had presented material factual disputes, FERC need not conduct such a hearing if [the disputes] may be adequately resolved on the written record. We cannot say that the Commission abused its discretion in considering Atlanta Gas's arguments based on the ample record before it.

Atlanta Gas Light, 140 F.3d at 1400.

Similarly, in Cascade, the Tenth Circuit rejected a party's contention that an evidentiary hearing should have been held by the Commission prior to approving a bypass arrangement. 955 F.2d at 1425-26. The Court stated that in order for a hearing to be necessary, a party must: (1) make material allegations of fact, (2) supported by an adequate proffer of evidence, (3) that are material to the dispute. Id. The Court noted that "[a]bsent more specific guidance from the statute, common sense dictates that the Commission be given flexibility in deciding how it will use its resources to achieve the purposes of the hearing." Id. at 1425.

We conclude that the Commission did not abuse its discretion by denying Dalton's request for an evidentiary hearing or for related discovery. Most of

23

Dalton's arguments really are directed at the Commission's bypass policy, and an evidentiary hearing would not have been helpful as to those issues. To the extent that Dalton argues there were anti-competitive or otherwise nefarious intentions underlying the proposed arrangement, it has proffered no evidence supporting that allegation. Nor do its unsupported allegations, such as the possible existence of some unspecified, anti-competitive agreement between Interconn and Beaulieu, appear plausible. Moreover, it appears to us that much of the information which Dalton sought through discovery in the FERC proceeding could have been obtained publicly or through other methods. Therefore, we conclude that the Commission did not abuse its "broad discretion" by structuring its proceedings in the way that it did or by denying Dalton the discovery that it sought.

C.    FERC's Interpretation of Southern's Tariff and Authorization of the Bypass Conection

Finally, we turn to Dalton's remaining challenges to the propriety of the Commission's decision to grant Southern's request and authorize the new facilities. Dalton challenges this decision on several bases, including that: (1) Beaulieu, Interconn and Southern did not comply with the technical terms of § 36 of Southern's tariff concerning requests for direct delivery connections; (2) Section 36 of the tariff violates §§ 4(a) and (b) of the NGA and is unduly discriminatory or

24

otherwise unlawful; and (3) FERC's approval of the connection to Beaulieu was arbitrary and capricious.

Many of Dalton's arguments really amount to a challenge to the Commission's policy of approving direct delivery connections to pipelines in order to encourage competition in the natural gas industry. Dalton also protests the Commission's conclusion that the approval of the particular connection at issue in this case would increase competition or otherwise be in the public interest. In support of these arguments, Dalton put forth evidence that, according to its calculations, Beaulieu's natural gas costs would increase as a result of the direct connection as compared to the costs it currently pays Dalton. Dalton also maintains that the Commission paid insufficient attention to the effect of the bypass connection on Dalton and its captive customers who might incur increased costs as a result of Dalton's loss of revenue from Beaulieu. Based in part on these contentions, Dalton challenges the Commission's finding of public convenience and necessity and argues that the Commission's approval of the transport of natural gas and related facilities was improper under both Southern's tariff and applicable provisions of the NGA.

In <u>Atlanta Gas Light Co. v. FERC</u>, 140 F.3d 1392 (11th Cir. 1998), this Court explained that:

The standard of review of FERC decisions is governed by § 19(b) of the NGA, which makes the Commission's findings of facts "conclusive" if supported by "substantial evidence." 15 U.S.C. §717r(b). This standard is no more than a recitation of the application of the "arbitrary and capricious" standard to factual findings. The "arbitrary and capricious" standard hails from the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), which requires us to uphold the Commission's actions, findings, and conclusions unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

The scope of our "arbitrary and capricious" review is narrow; we must not ... substitute [our] judgment for that of the agency, but rather determine whether there was a rational connection between the facts found and the choice made, and examine whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.

Id. at 1397 (citations and quotations omitted).

In addition to limiting our review of FERC's decisions under the arbitrary and capricious standard, we have also held that the Commission is entitled to substantial deference in interpreting tariffs. In Southern Natural Gas Co. v. FERC, we stated:

The construction of the minimum bill tariff is within the primary jurisdiction of the Commission. As the Supreme Court has emphasized, Congress has entrusted the regulation of the natural gas industry to the informed judgment of the Commission, and not to the preferences of reviewing courts. A presumption of validity therefore attaches to each exercise of the Commission's expertise. The Commission's interpretation of the tariff need not be the only reasonable one or even the one that we would necessarily reach if we were to decide the issue initially; if the Commission's interpretation of the tariff is reasonable, it must be upheld.

26

780 F.2d 1552, 1558 (11th Cir. 1986) (citations and quotations omitted).

Moreover, we have held that when reviewing the Commission's application and interpretation of the provision's of a tariff, the Court will not "elevate form over substance," but instead will allow the Commission some leeway in applying tariff provisions in such a way as to effectuate their intent. Atlanta Gas Light, 140 F.3d at 1400-01.

Based on our review of the record, we must reject all of Dalton's challenges to the Commission's interpretation of Southern's tariff and to the propriety of the requested direct delivery connection. We cannot conclude that the decision of the Commission was arbitrary and capricious.[10] Furthermore, the Commission's interpretation of Southern's tariff was reasonable, and its decisions complied with that tariff and with the applicable provisions of the NGA. In particular, we believe that FERC's policy of encouraging competition in the natural gas industry by approving direct delivery connections, and its practice of deferring to end-users determinations of what arrangements are in their economic best interest, are

---

[10]Dalton argues that the Commission failed adequately to take account of the fact that costs will be shifted to other Dalton customers as a result of the loss of revenue from Beaulieu. After reviewing the record, we cannot conclude that the Commission acted arbitrarily or capriciously by dismissing Dalton's arguments as overly speculative, and as subject to the ability of either Dalton or other state agencies to take steps to limit any negative impact on captive consumers.

reasonable.  See Midcoast Interstate Transmission, Inc. v. FERC, 198 F.3d 960, 968 (D. C. Cir. 2000) (noting that "FERC was entitled to rely on . . . general economic theory").  Therefore, the Commission's decisions are due to be affirmed.

## III.  CONCLUSION

For these reasons, we conclude that FERC had jurisdiction pursuant to the NGA to consider Southern's request to establish a direct delivery pipeline connection for Beaulieu because the proposed arrangement involved the interstate transport of natural gas.  We also conclude that the Commission did not abuse its discretion in structuring its proceedings as it did, and that the Commission's decision to approve the new facilities was supported by substantial evidence and was not otherwise arbitrary or capricious.  Therefore, we affirm the Commission's decisions in all respects.

AFFIRMED.